REDACTED

HONORABLE THOMAS S. ZILLY

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON
9                     AT SEATTLE

10   NATHAN RIENSCHE, individually and on
     behalf of all the members of the class of        Case No.: C06-1325 TSZ
11   persons similarly situated,
                                                      DEFENDANTS' RESPONSE TO
12                 Plaintiffs,                         MOTION FOR CLASS
                                                      CERTIFICATION
13         v.

14   CINGULAR WIRELESS LLC, a Delaware                Noted on Motion Calendar:  August 17,
     limited liability company, d/b/a Cingular        2007[1]
15   Wireless, NEW CINGULAR WIRELESS
     SERVICES, INC., a Delaware corporation,          **ORAL ARGUMENT REQUESTED**
16   d/b/a AT&T Wireless, NEW CINGULAR
     WIRELESS SERVICES PURCHASING
17   COMPANY, L.P., a Delaware limited
     partnership, d/b/a Cingular Wireless and NEW
18   CINGULAR WIRELESS PCS, LLC, a
     Delaware limited liability company, d/b/a
19   Cingular Wireless,

20                 Defendants.

21

22

23

24

25

26   _____
     [1] The parties agreed that Cingular would file its response on July 27, which Cingular is doing.  Declaration of
     Shelley M. Hall ("Hall Decl."), Ex. A.  Cingular has separately moved to set a briefing schedule that would allow
27   Cingular to complete the deposition of Jared Peck and to file a supplemental brief in opposition to class certification.
     Dkt. # 77.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION          **STOKES LAWRENCE, P.S.**
- C06-1325 TSZ                                                   800 FIFTH AVENUE, SUITE 4000
34001-521 \ 270280.doc                                          SEATTLE, WASHINGTON 98104-3179
                                                                       (206) 626-6000

# I.  INTRODUCTION

Every class certification decision requires close scrutiny and "rigorous analysis." It is not enough to take a "certify now, worry later approach," *Amchem Prods. v. Windsor*, 521 U.S. 591, 620-23 (1997), although that is exactly what Plaintiff urges here. Instead, the Court must analyze whether it could, and should, conduct one trial on all the putative class members' claims, and whether such a trial would allow Cingular[2] to vigorously defend itself against each of the varied claims. An analysis of the facts and law in this case shows that one trial cannot protect the rights of absent class members or of Cingular, nor would it prove manageable for the Court.

Mr. Riensche wants to represent a statewide class of Cingular customers who paid a B&O Surcharge line item on their invoices because he alleges that the contracts did not allow the charge and Cingular failed to adequately disclose it. Mr. Riensche ignores the complexities inherent in such claims. Customers received different contracts and disclosures over time; they initiated service through different sales channels where disclosures varied; they made individual choices about whether or not to review materials or seek additional information; and they made individual decisions about whether to pay their bills, complain or extend their service contracts. All of these factors, in addition to Mr. Riensche's own unusual circumstances, render group treatment impossible. There is simply no way to reconcile these different experiences in one trial.

Judge Coughenour did certify a class in a case in which plaintiff's counsel makes similar allegations against Sprint, *Hesse v. Sprint Spectrum, et al*, C06-0592-JCC. That case involves the same plaintiff's counsel, the same allegations, and the same industry. That is where the similarities end. Contrary to Plaintiff's assumptions, the *Hesse* decision did not resolve the class certification issue for this Court in this case. Sprint's contracts and disclosures, and the customer experiences at issue in *Hesse*, differ significantly from the facts here. This Court must, in the context of the facts of this case, reach its own conclusion about whether a trial based on generalized evidence of one customer's unique experiences is the proper approach to address the

---

[2] Defendants are referred to collectively as Cingular in this brief.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -1-
34001-521 \ 270280.doc

1   varied claims of all Cingular customer in Washington.  Cingular submits that, unlike *Hesse*,
2   individual issues predominate, the class representative is atypical and inadequate, and the case
3   would devolve into "mini-trials" that would create insurmountable management problems.
4   Cingular respectfully requests that the Court deny Plaintiff's motion for class certification.

## II.   FACTUAL BACKGROUND

### A.   Background on the B&O Surcharge

7   Washington state imposes a business and occupation tax on businesses operating in the
8   state, including Cingular.  RCW 82.04.010 *et seq.*  The B&O tax, as it is known, is a gross
9   receipts tax based on Cingular's revenues in the state.  Declaration of Gary Lindsey ("Lindsey
10  Decl.") ¶ 2.  On July 2002 invoices, Cingular began passing the cost of the tax through to its
11  Washington subscribers in the form of a surcharge set forth as a separate line item on each bill.
12  *Id.* ¶¶ 3-5.  Cingular used the funds it collected from the line-item charge to defray the costs of
13  the B&O tax.  *Id.* ¶ 2.  Cingular did not retain any of the surcharge funds.  *Id.*  Cingular
14  suspended collection of the surcharge in January 2006.  *Id.* ¶ 6.

### B.   Cingular Customer Contracts Expressly Allowed the B&O Surcharge

#### 1.   Terms and Conditions Contained Both General and Specific Terms Discussing the Surcharge

Cingular provides its customers with terms and conditions of service ("Terms") when
they initiate service, renew a service commitment or upgrade equipment.  Declaration of Hillary
Lamont ("Lamont Decl."), ¶ 3.  Earlier in the relevant time period, customers received the Terms
in booklets in the box with their new phone and, later, as part of a Welcome Kit sent to
customers separately.  Declaration of Karen Bryant ("Bryant Decl."), Ex. C; Dkt. #6, ¶ 5
(9/21/06 Bennett Declaration).  Customers who initiated service at a Cingular retail store or at a
third-party dealer store also signed Wireless Service Agreements that contained the Terms.
Bryant Decl., Ex. B.  Every version of the Terms authorized Cingular to assess additional
surcharges on the base rate, including the B&O Surcharge.  The language of the Terms changed

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -2-
34001-521 \ 270280.doc

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    somewhat over time and differed based on whether the customer initiated service online or in a

2    retail store.

3          For example, from June 2002 until 2004, the Terms from the booklet included in the box

4    with the phones stated:

5                Charges include . . . applicable taxes and governmental fees,
             whether assessed directly upon you or upon Cingular. You agree
6                Cingular may add its own charges to those charged by third parties.

7    Lamont Decl., Ex. A.[3]  The Terms contained on the signed Wireless Service Agreements

8    received in stores in 2002 mirrored the Terms in the booklets.  Bryant Decl., Ex. B.  From

9    November 2003 through 2005, however, the front page of the Wireless Service Agreement

10   contained additional language that explicitly referenced gross receipts surcharges:

11               Cingular imposes the following charges: . . . a Regulatory Cost
             Recovery Fee . . . *a gross receipts surcharge*, and State and
12               Federal Universal Service charges.

13   *Id.* (emphasis added).

14         Customers who initiated service online, as Mr. Riensche did, received Terms with their

15   equipment or in Welcome Kits, and they were required to acknowledge reading the Terms online

16   prior to finalizing their purchases.  Dkt. # 6 ¶¶ 3, 5.  Mr. Riensche's 2004 Terms contained the

17   following provision:

18               Charges include, without limitation . . . applicable taxes and
             governmental fees, whether assessed directly upon you or upon
19               Cingular.  Cingular may add its own charges to those charged by
             third parties.
20
     *Id.* at 10.  This disclosure language in the Terms was used online from at least April 2004
21
     through the end of the class period.  Dkt. # 6 ¶ 4.
22
                   **2.     Rate Plans Incorporated Into the Contracts Disclosed Surcharges**
23
           Each version of Cingular's Terms incorporated the relevant rate plan terms into the
24
     contracts.  *See, e.g.,* Bryant Decl., Exs. A-B; Lamont Decl., Ex. A.  Rate plan documents
25
     available at the retail stores and online provided varying disclosures about surcharges.  For
26

27   _____
     [3] Cingular has attached to this brief a demonstrative chart that contains the various disclosures available.  The full
     documents are included as exhibits to declarations submitted concurrently.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION       **STOKES LAWRENCE, P.S.**
- C06-1325 TSZ -3-                                                       800 FIFTH AVENUE, SUITE 4000
34001-521 \ 270280.doc                                             SEATTLE, WASHINGTON 98104-3179
                                                                         (206) 626-6000

1  example, a plan in effect when Cingular began assessing the B&O Surcharge in 2002 said

2  "prices do not include taxes, directory assistance, roaming, universal service fees and other

3  exactions." Bryant Decl., Ex. C. Cingular added more detail to its rate plan disclosures later in

4  2002:

> Calls subject to . . . *a gross receipts surcharge* or other charges,
> which are subject to change . . . . Prices do not include taxes . . . or
> other exactions.

7  *Id.*, Ex. D (emphasis added). Rate plans from then on included the gross receipts surcharge

8  disclosure. Lamont Decl., Ex. B.

9      **C.**    **Customers Learned of the B&O Surcharge Through Other Disclosures**

10            **1.**    **The Cingular Service Summary**

11       Since May 2004, Cingular has provided a Cingular Service Summary ("CSS"), in

12  addition to the Terms, to every customer who initiates service. Lamont Decl. ¶ 6. The CSS is a

13  reference document that informs customers about their key contract terms. Sales persons in

14  Cingular retail stores are instructed to review the CSS in detail with each customer. Hall Decl.,

15  Ex. B at 97-100.[4] Customers who purchase service online receive a copy of their CSS with the

16  Welcome Kit. Dkt. # 6 ¶ 6, Ex. B.

17       The original CSS was a four-page document that contained a section called

18  "Understanding My Next Bill." Lamont Decl., Ex. D. That section estimated the additional

19  surcharges and fees a customer would see on the first invoice, including a section called

20  "Credits, Adjustments & Other Charges." *Id.* Under that heading was a line-item for "State

21  Gross Receipts Surcharge" and an estimated amount that the customer would pay. *Id.*

22       The current CSS, implemented in September 2005, is a two-page document that contains

23  the same language in the "Understanding My Next Bill" section. *Id.*, Ex. E. It adds language to

24  that section, however, explaining that gross receipts surcharges, and other surcharges, "are not

25  taxes or government required charges." *Id.* In addition, it provides resources about how

26  

27  _____

[4] Excerpts of the transcript from the deposition of Jared Peck are attached to the Hall Declaration and will be cited hereafter as "Peck Dep. at #."

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION - C06-1325 TSZ -4-
34001-521 \ 270280.doc

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1  Cingular calculates the B&O Surcharge: "For actual state percentages, visit

2  www.cingular.com/customer_service/additional_charges." *Id.*

3  ### 2.      Disclosures on Cingular's Website

4        Customers who initiated service or renewed service for another term through Cingular's

5  website, as Mr. Riensche did, had even more resources available to them that supplemented the

6  Terms. For example, throughout the time period when Cingular assessed the B&O Surcharge, a

7  section of the website called "Understanding Your Bill" provided a popup window called

8  "Credits, Adjustments & Other Charges." Dkt. # 44, Ex. D (05/31/07 Hall Declaration). That

9  popup explained that:

10               This section lists the credits and/or other charges for services, fees,
               or other special charges (when they apply). Your activation fee
11               will also be listed here. The Regulatory Cost Recovery Charge /
               Regulatory Program Charge, Universal Service Fund Fee, and
12               ***Gross Receipts surcharge*** are in this section.

13  *Id.* (emphasis added). In addition, starting in at least November 2004, the website included an

14  "Additional Charges Details" popup that customers could click to obtain even more information

15  about fees on their wireless bills based on the customer's Washington zip code:

16               State Gross Receipts Surcharge

17               A fee that Cingular Wireless assesses on the customer that allows
               it to recover its costs with regard to specific government taxes
18               imposed on the Company's gross receipts. The Gross Receipts
               Surcharge is not a mandated charge to the customer.
19
    Declaration of Harry Bennett, Ex. A.
20
    ### 3.      Sales and Customer Care Provided Detailed Information
21
          Customers who wanted additional information about the B&O Surcharge could obtain it
22
    before initiating service by asking their sales person or calling customer care. Cingular's intranet
23
    (internal system) contained the following explanation of the B&O Surcharge:
24

25  

26

27

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -5-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

2

3

4   Declaration of Steve Bethel ("Bethel Decl."), Ex. A. This explanation was available on

5   Cingular's intranet from at least May 2004 through February 2006, when Cingular suspended

6   collection of the charge. *Id.*

7        Cingular's customer care representatives and retail sales representatives had access to the

8   intranet and this explanation when serving customers and answering customers' inquiries. *Id.* ¶

9   3; Peck Dep. at 63.[6] Mr. Peck, who was a retail sales representative, testified that he accessed

10  the intranet daily. Peck Dep. at 63. He also testified that the Cingular retail stores had phone

11  connections directly to customer care. *Id.* at 54. He referred customers to the customer care

12  access phone if they had questions he could not answer.[7] *Id.*

13       In addition, sales representatives and customer care representatives received training that

14  included information on taxes and surcharges.

15

16                                Lamont Decl. ¶ 5, Ex. C.

17                                                              . *Id.*[8]

18            **4.     Invoices Disclosed the B&O Surcharge**

19       The invoices that customers, such as Mr. Riensche, received from March 2004 until

20  Cingular discontinued the B&O Surcharge in February 2006 contained four primary sections

21  titled: "Monthly Service Charges," "Usage Charges," "Credits, Adjustments & Other Charges,"

22  and "Taxes." Lindsey Decl., Ex. C; Dkt. # 44, Ex. B. Under the section called "Credits,

23  Adjustments & Other Charges" was a subsection called "Gross Receipts Surcharges to Recover"

24  _____

[5] Cingular added the last line to the intranet description in August 2005. Bethel Decl. ¶ 4.

25  [6] Third-party resellers received access to the intranet in late 2004. Peck Dep. at 41-42.

[7] Mr. Peck testified that he contacted customer care about the B&O Surcharge once on behalf of a customer and that
26  customer care told him the B&O Surcharge was a tax. Peck Dep. at 57-58. This contradicts the description of the
B&O Surcharge available to customer care representatives on the intranet. Bethel Decl., Ex. A.

27  [8] Mr. Peck, when he worked for Cingular, apparently ignored this instruction. He testified that he did not review
taxes with customers when discussing the CSS. Peck Dep. at 62.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION     **STOKES LAWRENCE, P.S.**
- C06-1325 TSZ -6-                                          800 FIFTH AVENUE, SUITE 4000
34001-521 \ 270280.doc                                     SEATTLE, WASHINGTON 98104-3179
                                                           (206) 626-6000

1    and under that subsection was a line item called "State B&O Surcharge." Lindsey Decl., Ex. C.

2    Invoices from July 2002 through August 2003 listed the surcharge as "State B and O Tax." *Id.*

3    ¶¶ 3-4, Ex. A. Cingular renamed it the "State B&O Surcharge" in September 2003. *Id.* ¶ 4, Ex.

4    B. The invoices also provided subscribers with the toll-free number for customer care, where

5    they could obtain additional information if they had any questions. *Id.*

6    **D.    Plaintiff Nathan Riensche and His Wireless Service History**

7         Nathan Riensche is a certified public accountant with a graduate degree in professional

8    accounting. He specializes in tax issues, including state and local taxes such as the B&O tax.

9    Dkt. #44, Ex. A at 6-8 (hereinafter "Riensche Dep."). For several years before signing up for

10   Cingular's services, Mr. Riensche prepared Washington B&O tax returns for the Seattle Times.

11   *Id.* at 12. He obviously knew about Washington's B&O tax, how it is calculated, and on whom it

12   is imposed. *Id.* at 8-9, 12.

13        Mr. Riensche also is a recidivist putative class action plaintiff, having sued his former

14   wireless carrier before. Mr. Riensche's first putative class action against AT&T Wireless

15   ("AWS"), in which he was also represented by his current counsel, asserted that AWS breached

16   its contracts with customers and violated the Washington Consumer Protection Act ("CPA") by

17   charging customers a Universal Connectivity Charge. *Schnall v. AT&T Wireless,* No. 02-2-

18   05776-4SEA (Wash. Super. 2002). In April 2004, six months prior to Cingular's acquisition of

19   AWS, Mr. Riensche switched his wireless service to Cingular using the Cingular website. Dkt. #

20   6 ¶ 3. Mr. Riensche admits that at the time he signed up for service he knew there would be

21   surcharges on his bill in addition to his "base rate." Riensche Dep. at 32-33. Even with this

22   expectation, Mr. Riensche elected not to review any information on the website about those other

23   charges. *Id.* at 32-34.

24        After selecting a phone and rate plan and inputting his contact and billing information,

25   Mr. Riensche was presented with Cingular's Terms. *Id.* at 35-36. Although he had the

26   opportunity to review and print the Terms before he contracted with Cingular, he did neither,

27   even though he was at that time a putative class representative in a case claiming that his

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -7-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   wireless service provider had failed to disclose information about certain charges. *Id.* at 35-37.

2   Instead, Mr. Riensche simply clicked on the button indicating that he had read the Terms and

3   agreed to be bound by them. *Id.* After Mr. Riensche clicked his acceptance, Cingular sent him

4   the wireless phone he ordered. Dkt. # 6 ¶ 4. Mr. Riensche activated this phone on April 12,

5   2004. *Id.* While he does not remember what else he received in the box, he remembers that he

6   discarded all written material that came with his phone. Riensche Dep. at 39-40. Separately

7   from the phone, Cingular sent Mr. Riensche a Welcome Packet, which included another copy of

8   the Terms. Dkt. # 6 at 5.

9        Mr. Riensche received his first invoice from Cingular in May 2004. Dkt. # 44, Ex. B. He

10  paid that bill, including the 51-cent State B&O Surcharge. Riensche Dep. at 42-43. In fact, Mr.

11  Riensche paid every bill he received in 2004 and 2005, all of which contained a B&O Surcharge.

12  *Id.* at 42-43, 45. Not once during this time did he write, call or otherwise attempt to

13  communicate with Cingular about the B&O Surcharge. *Id.* at 40, 44-45.

14       On July 17, 2006 — two days before he sued Cingular — Mr. Riensche entered into a

15  new contract, again by visiting Cingular's website. *Id.* at 47-50; Dkt. # 6 ¶ 6. He upgraded his

16  phone, committed to a new 24-month contract term, and agreed to be bound by the current

17  version of the Terms without bothering to read them. Riensche Dep. at 48-49. As before,

18  Cingular mailed the new phone to him, generated a Welcome Packet, and sent that to him. Dkt.

19  # 6 ¶ 3. Mr. Riensche remains a Cingular customer today.

20      **E.**     **Procedural History of B&O Surcharge Lawsuits**

21      **1.**     **Jared Peck and His Parallel Lawsuits Against Cingular**

22       The history of this case actually began with a different matter. In February 2006, Jared

23  Peck, represented by the same lawyer representing Mr. Riensche here, filed a lawsuit against

24  Cingular, claiming that the B&O Surcharge violated RCW 82.04.500, the B&O tax statute. *Peck*

25  *v. Cingular Wireless*, No. C06-343TSZ ("Peck I"). After Cingular removed the lawsuit, this

26  Court dismissed the complaint on preemption grounds. *Peck I*, Dkt. # 61. Mr. Peck appealed,

27  and that dispute is fully briefed and pending before the Ninth Circuit. Meanwhile, Mr. Peck,

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION    **STOKES LAWRENCE, P.S.**
- C06-1325 TSZ -8-                     800 FIFTH AVENUE, SUITE 4000
34001-521 \ 270280.doc                   SEATTLE, WASHINGTON 98104-3179
                           (206) 626-6000

1   again represented by the same lawyer representing Mr. Riensche, filed a second lawsuit against

2   Cingular, No. C 07-0522 TSZ ("Peck II"), also challenging the B&O Surcharge but attempting to

3   avoid preempted causes of action. That case is pending before this Court and only asserts claims

4   from January 2006 forward.[9]

5          As an example of the difficulties that would exist if a class were certified in this case, Mr.

6   Peck's experiences as a Cingular customer differed greatly from Mr. Riensche's. Mr. Peck

7   initially obtained Cingular service in 2004 when he worked as a salesperson at a third-party

8   retailer — a store that exclusively sold Cingular wireless services but was not owned by

9   Cingular. Peck Dep. at 38, 71. While there, Mr. Peck received trainings about Cingular's

10  services and rate plans, contract terms and disclosures to customers. *Id.* at 40-41. Mr. Peck

11  began working directly for Cingular in December 2004. *Id.* at 43-44. While a Cingular

12  employee, Mr. Peck received additional trainings on Cingular's services. *Id.* at 101. He also

13  read Cingular's Terms as part of his job. *Id.* at 59.

14         As a salesperson, Mr. Peck fielded questions from customers about a variety of topics,

15  including the B&O Surcharge. *Id.* at 56-57. He even called Cingular's customer care

16  department to obtain more information on the B&O Surcharge for one customer. *Id.* He also

17  had access to the same intranet materials that customer care used, which included a page

18  explaining the B&O Surcharge. *Id.* at 63; Bethel Decl., Ex. A. As a general practice, Mr. Peck

19  explained to each customer the estimated amount of the first bill, including taxes and surcharges.

20  *Id.* at 62-63, 100. He made clear to all customers that the total cost of service included fees and

21  taxes. *Id.* He also walked each customer through the provisions of the CSS before finalizing any

22  sale. *Id.* at 97-100.

23         Mr. Peck resigned from Cingular in January 2006 and transferred his Cingular employee

24  account to a month-to-month consumer account. *Id.* at 74. Cingular then sent a CSS to Mr.

25  Peck, as it does with other customers who upgrade or change their service. Hopkins Decl. ¶ 7,

26

27  ----------
    [9] Because Cingular stopped billing the B&O Surcharge before issuing its February 2006 invoices, Mr. Peck's case
    encompasses just one month of B&O Surcharges, in the total amount of 31 cents.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -9-
34001-521 \ 270280.doc

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    Ex. E.  Later that month, Mr. Peck received his first invoice as a non-employee, and it contained

2    a B&O Surcharge.  Peck Dep. at 80, 85-86.  Mr. Peck terminated his Cingular service in April

3    2006, falsely claiming that he was traveling overseas.  *Id.* at 77-78.  He failed to pay his invoices

4    with Cingular and owed $361.97 when he terminated service, which remains unpaid.  Bethel

5    Decl. ¶ 8.

6                          **2.     Mr. Riensche's Lawsuit Against Cingular**

7              In August 2006, several months after Mr. Peck first sued Cingular, Mr. Riensche filed

8    this lawsuit.  Mr. Riensche's claims encompass a much larger time period than Mr. Peck's

9    complaint, although they similarly allege that Cingular breached his contract, violated the CPA

10   and was unjustly enriched by charging the B&O Surcharge without properly disclosing it to

11   customers or including it in contracts.  This Court dismissed as preempted any challenges to the

12   reasonableness of the B&O Surcharge itself.  Dkt. # 31.  Cingular also has moved for summary

13   judgment on Mr. Riensche's individual claims.  Dkt. # 43.  Among other things, the motion

14   alleges that Mr. Riensche's contract allows Cingular to assess the B&O Surcharge, and that Mr.

15   Riensche's CPA claim fails because he purposely chose not to read any Cingular disclosures and

16   already knew what the B&O Surcharge was.  *Id.*  That motion remains pending before the Court.

17             Shortly after Cingular filed the summary judgment motion, Mr. Riensche filed this

18   motion for class certification under Fed. R. Civ. P. 23(b)(3).  He asks to certify the same class for

19   all three of his causes of action:

20                 [a]ll current or past Washington state customers of Cingular
                   Wireless LLC, et al., now AT&T Mobility ("Cingular") who were
21                 billed and paid a "State B&O Surcharge."

22   Dkt. # 45 at 1.  Because class certification is inappropriate on any of the claims, Cingular files

23   this opposition brief.

24                          **III.  ARGUMENT AND AUTHORITY**

25   **A.      The Class Certification Motion and Underlying Facts Require Close Scrutiny**

26             As this Court knows, it must conduct a "rigorous analysis" of Rule 23's requirements to

27   determine whether class treatment is appropriate in each case.  *LaCasse v. Wash. Mut., Inc.*, 198

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -10-
34001-521 \ 270280.doc                          **STOKES LAWRENCE, P.S.**
                                                800 FIFTH AVENUE, SUITE 4000
                                                SEATTLE, WASHINGTON 98104-3179
                                                (206) 626-6000

1    F. Supp. 2d 1255, 1260 (W.D. Wash. 2002); *see also Valentino v. Carter-Wallace, Inc.*, 97 F.3d

2    1227, 1233 (9th Cir. 1996); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D.

3    614, 615 (W.D. Wash. 2003).  Mr. Riensche bears the burden of proving that his proposed class

4    meets each of the requirements.  *Amchem Products*, 521 U.S. at 614; *Valentino*, 97 F.3d at 1234;

5    *LaCasse*, 198 F. Supp. 2d at 1260.  Fed. R. Civ. P. 23(a) sets out the four fundamental elements

6    for certifying a class:  numerosity, commonality, typicality and adequacy of representation.  A

7    bare recitation of Rule 23's requirements is insufficient, as plaintiff must show actual, not

8    presumed, conformance with Rule 23(a).  *Gen. Tel. Co.  v. Falcon*, 457 U.S. 147, 160-61 (1982).

9    "[G]oing beyond the pleadings is necessary, as a court must understand the claims, defenses,

10   relevant facts, and applicable substantive law in order to make a meaningful determination of the

11   certification issues."  *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

12          In addition, Mr. Riensche must satisfy the requirements of Rule 23(b)(3), which permits

13   certification of an opt-out class for damages only where common questions of law or fact

14   "predominate over any questions affecting only individual members," and "a class is superior to

15   other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ.

16   P. 23(b)(3).  Rule 23(b)(3)'s requirements pose more rigorous tests than 23(a) and are designed

17   to serve the goal of judicial economy in fact, not just in theory.  *In re Am. Med. Sys.*, 75 F.3d

18   1069, 1085 (6th Cir. 1996).  For that reason, they require a realistic analysis of "how the

19   plaintiffs' . . . claims would be tried, individually or on a class basis."  *Castano*, 84 F.3d at 744.

20   "[T]he plaintiffs must demonstrate an ability to utilize generalized, class-wide evidence" to

21   prove their claims at trial.  *LaCasse*, 198 F. Supp. 2d at 1261.  The Court then must make a

22   "sophisticated and necessarily judgmental appraisal of the future course of the litigation, as well

23   as an evaluation of the most efficient means of proving the claims and the time that will be

24   consumed by each aspect of the proof."  *Waldo v. N. Am. Van Lines, Inc.*, 102 F.R.D. 807, 812

25   (W.D. Pa. 1984).  Mr. Riensche cannot carry his burden under either Rule 23(a) or (b)(3).

26

27

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -11-
34001-521 \ 270280.doc

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    **B.    Individual Issues Would Predominate at Trial**

2    The predominance requirement of Rule 23(b)(3) "tests whether proposed classes are

3    sufficiently cohesive to warrant adjudication by representation." *Duncan v. Northwest Airlines,*

4    *Inc.*, 203 F.R.D. 601, 611 (W.D. Wash. 2001) (quoting *Amchem*, 521 U.S. at 623). The proposed

5    class fails the test if "[r]egardless of the merits of any individual claim, there would simply be no

6    way to determine liability in a generalized manner." *LaCasse*, 198 F. Supp. 2d at 1264. It is not

7    enough to say that some common questions exist; "[i]nstead, the inquiry must focus on the law

8    and facts 'that qualify each class member's case as a genuine controversy.'" *Duncan*, 203

9    F.R.D. at 612 (quoting *Amchem*, 521 U.S. at 623).[10] Any trial of Mr. Riensche's three claims

10   would turn on the individual circumstances he experienced when purchasing wireless service.

11   The predominance of individual issues renders class treatment impossible.

12   **1.    CPA Issues in This Case Are Inherently Individual**

13   Mr. Riensche's CPA claim is not that Cingular cannot charge the B&O Surcharge, it is

14   that Cingular did not tell the putative class members that it would do so before they subscribed.

15   As such, the CPA claim will require this Court to determine whether the materials provided to,

16   and reviewed by, customers adequately disclosed that Cingular reserved the right to assess a

17   B&O Surcharge. Each plaintiff must show: (1) an unfair or deceptive act or practice; (2)

18   occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff and (5)

19   causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 784-

20   85, 719 P.2d 531 (1986); *see also Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104,

21   113, 22 P.3d 818 (2001). Customers across the state could not, in this particular case, use

22   generalized evidence to prove each element of their claims.

23   **(a)    The Deception Analysis Will Vary By Customer Experience**

24   Mr. Riensche must show that the materials available to customers (or not available) had

25   the same capacity to deceive. *Robinson*, 106 Wn. App. at 122. But here, customers received

26

27   ---
[10] The commonality element is similar to predominance, although less rigorous. *Duncan*, 203 F.R.D. at 610.
Because of the overlap, Cingular will analyze them together and will focus on predominance.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -12-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    different disclosures from Cingular based on when, where and how they purchased service.

2    Thus, the Court cannot determine whether Cingular's practices were deceptive to customers as a

3    whole.[11]

4           Mr. Riensche's experience alone shows the multiple difficulties in classwide analysis.

5    Mr. Riensche initiated service in April 2004, before Cingular launched the CSS. Thus, Mr.

6    Riensche received Terms but did not have the benefit of the CSS's gross receipts surcharge

7    disclosure. In contrast, all customers who initiated after May 2004 *did* receive those additional

8    disclosures. Mr. Riensche signed up online, so, unlike retail store customers, he could not as

9    easily ask sales representatives questions about surcharges.[12]  Mr. Riensche did, however, have

10   access to online disclosures about gross receipts surcharges, to which retail store customers did

11   not have direct access. Even if one narrows the analysis to Internet customers, Mr. Riensche had

12   access to fewer disclosures than customers who initiated later in the class period. Cingular added

13   a more complete explanation of gross receipts surcharges to the website in August 2004, which,

14   although not available to Mr. Riensche when he initiated service, was available to other putative

15   class members at the time they initiated their service. Finally, even if the class were narrowed to

16   Internet customers who could access the same disclosures as Mr. Riensche, he freely admits that

17   he did not read them, including the Terms, while other customers who initiated service online

18   undoubtedly did. Thus, it would be extremely difficult for the Court to use Mr. Riensche's

19   experience to determine whether Cingular's disclosures, even narrowed to that time period and

20   that venue, had the capacity to deceive.

21          At best, the Court would need to divide the proposed class into multiple groups based on

22   (1) when a customer initiated service, (2) the method used to initiate service, (3) the disclosures

23   available at that time in that venue, and (4) the customer's decision whether to review

24   disclosures, request additional information or initiate service blindly. The analysis of any

---

[11] Cingular believes all of its materials provided non-deceptive disclosures and it has moved for summary judgment on Mr. Riensche's individual claims.

Bethel Decl., Ex. A.  In late 2004, sales representatives at third-party retailers also received access to the intranet. Peck Dep. at 40-41.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -13-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    alleged deception will necessarily differ in each scenario. Because of the many variations in
2    what customers received or reviewed throughout the four years, a fair class trial on the merits is
3    simply not possible.

**(b)    The Issue of Materiality Requires Individual Analysis**

5         The CPA requires plaintiffs to show a "material" misrepresentation or omission. *See*
6    *Robinson*, 106 Wn. App. at 116 (citing *Hiner v. Bridgestone/Firestone, Inc.*, 91 Wn. App. 722,
7    730, 959 P.2d 1158 (1998), *rev'd in part on different grounds*, 138 Wn.2d 248, 978 P.2d 505
8    (1999)). The question of whether a particular disclosure was "material" is not susceptible to
9    classwide proof at trial, because priorities and experiences differed so much among customers.

10        Mr. Riensche obviously did not believe the B&O Surcharge disclosures were "material"
11   to his choice of wireless providers, because he declined to read any of the documents Cingular
12   provided. Riensche Dep. at 32-34. Mr. Riensche had different priorities, such as obtaining
13   "rollover minutes" and a regional calling plan. *Id.* at 27. His view of what is "material" in a
14   wireless provider's disclosures is obviously different from those who called to complain about
15   the B&O Surcharge. And it is different from the customers who asked sales representatives such
16   as Mr. Peck about the charge.

17        Judge Coughenour granted class certification in *Hesse* in part because Sprint had not
18   shown any concrete differences in customers' experiences or in the disclosures provided. In
19   contrast, Cingular presents evidence that materials available at stores and on the website varied,
20   as well as evidence that some customers (unlike Mr. Riensche) did ask questions of sales
21   representatives and did call customer care. Thus, the facts underlying Mr. Riensche's class
22   claims against Cingular differ greatly from those against Sprint.

23        To try this case on classwide evidence, the Court would need to decide which experience
24   is representative of the class. While the B&O Surcharge certainly may have been material to
25   some customers, those claims must be tried individually, not on the basis of Mr. Riensche's
26   experience or other generalized evidence. A trial would require individualized analysis or, at
27   best, mini-trials based on groups of customer experiences, making class treatment inappropriate.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -14-
34001-521 \ 270280.doc

**STOKES LAWRENCE, P.S.**
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   Other courts have denied class certification in disclosure cases because of different consumer

2   experiences. *See, e.g., Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255-56 (2d Cir. 2002);

3   *Peltier Enters. v. Hilton*, 51 S.W.3d 616 (Tex. App. 2000); *Humana, Inc. v. Castillo*, 728 So.2d

4   261 (Fl. App. 1999).

(c)   **The CPA Requires Individual Showings of Causation**

6        Each plaintiff must establish a causal connection between Cingular's acts and the alleged

7   injury. *See Hangman Ridge*, 105 Wn.2d at 784-85. When the alleged violation is some form of

8   deception, a plaintiff seeking damages must show that he or she relied upon or was materially

9   deceived by the contract and other disclosures. *See Nuttall v. Dowell*, 31 Wn. App. 98, 110-11,

10  639 P.2d 832 (1982) (a "party has not established a causal relationship with a misrepresentation

11  of fact where he does not convince the trier of fact that he has relied upon it"); *Hangman Ridge*,

12  105 Wn.2d at 793 (citing *Nuttall*). This is because a plaintiff who did not rely on a practice

13  logically has no standing to bring a CPA claim. *Fid. Mortgage Corp. v. Seattle Times Co.*, 131

14  Wn. App. 462, 468-69, 128 P.3d 621 (2005). The individualized analysis required to determine

15  causation, and standing, when parties received different disclosures, makes CPA cases improper

16  for class treatment because individual issues would predominate at trial. *See Davis v.*

17  *Homecomings Fin.*, 2006 WL 2927702, *7 (W.D. Wash. Oct. 10, 2006).

18       Even if the Court allowed plaintiff and his putative class a presumption of reliance,[13]

19  Cingular still would be entitled to rebut that presumption at trial and show that the disclosures

20  did not cause harm to individual class members. For example, Mr. Riensche, the named

21  plaintiff, admits he did not rely on Cingular's disclosures. In fact, he consciously chose not to

22  read the disclosures and relied instead on his prior knowledge of wireless services and the B&O

23  tax. *See Nuttall*, 31 Wn. App. at 111 (plaintiff relied on own research, not representations);

24  *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2000) (applying Pennsylvania's consumer

25  protection act and holding that consumers could not have suffered a loss unless they saw the

---

[13] *See Schnall v. AT&T Wireless Servs., Inc.*, 163 P.3d 395, 400-01 (Wash. App. 2007) (applying a presumption of
reliance to proposed class but recognizing that a party who obtained knowledge from outside sources could not
succeed on CPA claim). The defendants in *Schnall* have petitioned for review from the Washington Supreme Court.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -15-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1   supposedly misleading advertisement). At trial, Cingular will similarly be entitled to show that

2   other subscribers ignored disclosures and were not harmed. It also is entitled to prove that some

3   customers received an explanation of the B&O Surcharge from customer care representatives,

4   sales representatives, the Cingular website or through other sources and fully understood it so

5   that the disclosures did not cause them harm either. These are individualized merits questions

6   that cannot be proved through classwide evidence.[14]

7               **2.    The Contract Claims Raise Individual Issues**

8           Like the CPA claim, Mr. Riensche's contract claim raises individual issues. It is

9   undisputed that the putative class members' contracts differed. For example, the Wireless

10  Service Agreements signed by retail store customers between 2003 and 2005 contained an

11  explicit reference to "gross receipts surcharge." In contrast, the Terms received with new phones

12  and during online purchases did not. Each contract also incorporated the customer's rate plans.

13  Some rate plans referenced Cingular's gross receipts surcharge, while others did not, creating

14  even more differences. Bryant Decl., Ex. C; Lamont Decl., Ex. B. Courts have denied class

15  certification on predominance grounds when contract terms differed for various customers. *See*

16  *Sprague v. General Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998); *Brooks v. S. Bell Tel. &*

17  *Tel. Co.*, 133 F.R.D. 54 (S.D. Fla. 1990) (denying certification of a contract class where terms

18  derived from different written and oral representations); *Kaczmarek v. IBM*, 186 F.R.D. 307

19  (S.D.N.Y. 1999) (denying class certification because not all plaintiffs received standard

20  representations).

21          Even if every customer received the same exact contract language, class certification

22  would be inappropriate. Cingular believes its contracts allow the B&O Surcharge and has

23  brought a summary judgment motion on that issue. However, if the Court instead finds the

24  language ambiguous, evidence of the context in which the agreement was entered into is critical

25  to determine the meaning of the ambiguous term. *Berg v. Hudesman*, 115 Wn.2d 657, 663, 801

26

27  _____

[14] Cingular discussed the reliance requirement at greater length in its motion for summary judgment, Dkt. # 43, and reply on motion for summary judgment, Dkt. # 65. Cingular incorporates those arguments here.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -16-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

P.2d 222 (1990). Extrinsic context evidence, including evidence of each plaintiff's understanding of that language and each plaintiff's actions in light of the language, will be admissible to determine whether the contracts did, indeed, allow the B&O Surcharge. *Id.* at 678 (circumstances of making contract and later performance provide context evidence); RESTATEMENT (SECOND) OF CONTRACTS § 202(4) (1981). This would require analysis of which additional disclosure materials included the gross receipts surcharge, which customers received those materials, whether the customers — like Mr. Riensche — understood gross receipts to mean the B&O Surcharge, whether the customers viewed additional online disclosures, and whether the customers paid their invoices without complaint or renewed their service commitments (which shows they interpreted the surcharge as a proper fee). Generalized evidence will not apply for the entire class on these individual questions: "[T]he context of words and other conduct is seldom exactly the same for two different people, since connotations depend on the entire past experience and the attitudes and expectations of the person whose understanding is in question." RESTATEMENT (SECOND) OF CONTRACTS § 201 CMT B. Thus, common treatment is not possible. *See Mann v. GTE Mobilnet*, 730 So.2d 150, 155 (Ala. 1999) (contractual ambiguity "fatal" to efforts to certify contract claims against wireless provider).

### 3.    Individuals Must Choose Unjust Enrichment or Breach of Contract

If a valid contract exists between two parties, there can be no claim for unjust enrichment. *See, e.g., MacDonald v. Hayner*, 43 Wn. App. 81, 85-86, 715 P.2d 519 (1986). Potential class members must therefore choose whether they want to assert that Cingular breached a valid contract, or whether they want to pursue unjust enrichment. This is an individualized decision, making class treatment improper for trial, and other courts have denied class certification on unjust enrichment claims. *See, e.g., Cohn v. Mass. Mut. Life Ins. Co.*, 189 F.R.D. 209 (D. Conn. 1999); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 183 F.R.D. 217 (W.D. Mich. 1998); *Rollins, Inc. v. Butland*, 951 So.2d 860 (Fla. App. 2006); *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476 (Mass. 2004).

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -17-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

### 4.  Injury Requires Individual Analysis

Finally, every cause of action pleaded by Mr. Riensche requires a showing of injury. *See, e.g., Hangman Ridge*, 105 Wn.2d at 784-85 (CPA); *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.*, 78 Wn. App. 707, 712, 899 P.2d 6 (1995) (contract); *Dragt v. Dragt/DeTray, LLC*, 161 P.3d 473, 482 (Wash. App. 2007) (unjust enrichment requires showing that plaintiff provided a benefit to defendant). Because of how Cingular applied — and did not apply — the charge, injury is an inherently individual question. For example, customer care representatives have discretion to grant credits to dissatisfied customers. Bethel Decl. ¶ 6. They could, and did, credit the B&O Surcharge on some customers' accounts. *Id.* ¶ 7. Those subscribers, as a result, suffered no "injury" from the charge. Cingular's systems do not track all credits by subject matter, so determining which class members received credits likely would require manual review of each person's customer care records to see if the customer complained and if he or she received a credit. *Id.* ¶ 6.

Even setting aside the credit issue, some customers owed Cingular money when they terminated service. Mr. Peck still owes Cingular more than $350 for wireless service. *Id.* ¶ 8. In contrast, he alleges misrepresentation and breach of contract for a 31-cent B&O Surcharge. *Peck II*, Dkt. # 1 (Complaint). Mr. Peck obviously suffered no injury from the surcharge and, in fact, Cingular may assert a claim against him. This analysis across the entire class would require mini-trials to determine whether each class member incurred an injury and has standing to assert a claim. As this Court has said, "[b]ecause the damage question turns on the individual circumstances of each [class member], the issue of damages is not appropriate for class treatment." *Smith v. Univ. of Wash. Law School*, 2 F. Supp. 2d 1324, 1344 (W.D. Wash. 1998)

### 5.  Cingular's Defenses Will Raise Individual Issues

The Court also must consider Cingular's defenses when determining whether it could try the claims on a class basis. *See Castano*, 84 F.3d at 744 (the court "must understand the claims, *defenses*, relevant facts, and applicable substantive law") (emphasis added). Class certification is inappropriate when defenses would vary for each potential class member. *See State of Alaska*

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION - C06-1325 TSZ -18-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1  *v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997). Cingular's defenses will

2  apply to some members of the putative class, but not to others. Thus, Cingular is entitled to

3  prove those defenses at trial by using individualized evidence, and a class should not be certified.

4                       (a)      **The Voluntary Payment Defense Requires Individual Analysis**

5          The voluntary payment doctrine prevents a party from recovering payments when the

6  party had all the facts necessary to protest the payment, but failed to do so. *See, e.g., Hawkinson*

7  *v. Conniff*, 53 Wn.2d 454, 458, 334 P.2d 540 (1959) ("money voluntarily paid under a claim of

8  right to the payment, and with knowledge by the payor of the facts on which the claim is based,

9  cannot be recovered on the ground that the claim was illegal, or that there was no liability to pay

10 in the first instance"). Cingular could not use generalized evidence to prove this defense at trial,

11 because it turns on each customer's behavior. For example, Mr. Riensche knew before he

12 contracted with Cingular that his invoice would include additional charges, and, as a tax

13 accountant, he knew about the B&O tax. Yet he made absolutely no effort to read any

14 disclosures or to determine which surcharges Cingular would assess, and he made no effort to

15 read his contract or even his invoices. Because he had all the information needed to protest

16 payment, but chose not to, his claim is barred. This turns on his individual knowledge and

17 circumstances, which are very different from someone who, for example, read the materials or

18 complained to customer care after seeing the charge.

19         Other scenarios exist as well. Mr. Riensche has argued that his payments were

20 involuntary because he feared paying an early termination fee. But even assuming Mr. Riensche

21 could claim a "duress" exception to the voluntary payment doctrine, other putative class

22 members could not. Unlike Mr. Riensche, customers who had completed their contract terms

23 and were on month-to-month service had no early termination fee to fear and certainly paid

24 voluntarily. Yet another analysis would apply to the many customers who completed their

25 contract terms and voluntarily signed up for another term or added a second phone line in spite

26 of the B&O Surcharge. Granting class certification would essentially prohibit Cingular from

27 raising the voluntary payment defense at trial in any factual scenario different from Mr.

---

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -19-
34001-521 \ 270280.doc

1 │ Riensche's. Because Cingular is entitled to present and prove its defenses against each customer,

2 │ class certification is inappropriate and other courts have denied certification on such grounds.

3 │ *See Dreyfus v. Ameritech Mobile Commc'ns*, 700 N.E.2d 162, 165 (Ill. App. 1998) (dismissing

4 │ cellular customers' putative class action complaint on voluntary payment grounds); *Salvaggio v.*

5 │ *Houston Indep. Sch. Dist.*, 709 S.W.2d 306, 308 (Tex. App. 1986); *Fisher v. City of Ottawa*, 289

6 │ N.E.2d 717 (Ill. App. 1972).

7 │ **(b)** **The Statute of Limitations Creates Individual Issues**

8 │ The statute of limitations for unjust enrichment is three years. *See SPEEA v. Boeing Co.*,

9 │ 139 Wn.2d 824, 837, 991 P.2d 1126, 1 P.3d 578 (2000). The limit for CPA claims is four years.

10 │ RCW 19.86.120. Cingular assessed the B&O Surcharge from June 2002 through January 2006,

11 │ and Mr. Riensche filed his lawsuit in August 2006. Thus, his lawsuit was not filed in time to

12 │ include all customers who paid the B&O Surcharge. Those who paid the B&O Surcharge from

13 │ June-July 2002 are prohibited by the statute of limitations from pursuing a CPA claim; those

14 │ who paid from June 2002-July 2003 cannot proceed with an unjust enrichment claim. These

15 │ limitations will require individual analysis of records to determine whether some customers are

16 │ eliminated from the class on those claims, providing yet another individual issue that would

17 │ predominate. *See, e.g. Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 323, 329 (4th Cir.

18 │ 2006) (statute of limitations issues prevented class certification); *Barnes v. Am. Tobacco Co.*,

19 │ 161 F.3d 127, 149 (3d Cir. 1998) (court denied class certification because individual issues

20 │ predominated, including statute of limitations differences); *Western States Wholesale, Inc. v.*

21 │ *Synthetic Indus., Inc.*, 206 F.R.D. 271, 279 (C.D. Cal. 2002); *O'Connor v. Boeing N. Am., Inc.*,

22 │ 197 F.R.D. 404, 413 (C.D. Cal. 2000). *But see Cameron v. E.M. Adams & Co.*, 547 F.2d 473

23 │ (9th Cir. 1976) (statute of limitations differences alone do not create predominance of individual

24 │ issues if other individual issues do not exist). At the very least, the statute of limitations issue

25 │ requires a narrower class, which Mr. Riensche has failed to propose.[15]

26 │

---

[15] Cingular's other defenses also will vary across the class. Mr. Riensche, like many customers, renewed his service
27 │ commitment with Cingular. However, he renewed it after Cingular stopped assessing the B&O Surcharge. Unlike
Mr. Riensche, some customers likely renewed their service commitments during the four years that Cingular

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -20-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1

### C.   Mr. Riensche Is Not Typical of the Proposed Class

2       The named plaintiff's claims must be "reasonably coextensive with those of absent class

3   members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). For example, a

4   plaintiff cannot represent a class if he had no dealings with the defendant. *La Mar v. H&B*

5   *Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir. 1973). As this Court explained, "[b]ecause the

6   class, as defined by the plaintiffs, potentially includes class members who received [materials]

7   other than those received by the named plaintiffs, the class definition is broad and overinclusive.

8   There is no way to determine if the claims of the named plaintiffs are typical. . . ." *Scott v.*

9   *Mascott*, 1999 WL 33117204, *1 (W.D. Wash. Apr. 13, 1999). The same problem exists here.

10      Mr. Riensche contracted with Cingular, but he did not receive a CSS, look at any of the

11  online disclosures, read the Terms, or review his first bill.[16] Moreover, he initiated service

12  before Cingular made some disclosures available on its website and for use by sales

13  representatives. As such, he did not receive the same disclosures as portions of the putative

14  class. Even when compared to those who received the same disclosures (and failed to review

15  them), Mr. Riensche still is not typical because, as a tax accountant, he already knew about the

16  B&O tax. Moreover, as a repeat class action plaintiff, he knew Cingular assessed surcharges in

17  addition to the base rate and expected to pay those surcharges. His experience is not typical of

18  other class members, and he cannot represent them in this lawsuit.[17]

19

### D.   Mr. Riensche and His Counsel Are Inadequate

20      Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

21  the interests of the class." "The purpose of the adequacy of representation requirement is to

22  ensure that the rights of absent class members are represented vigorously by qualified counsel

23

---

24  assessed the charge. By renewing their contracts with full knowledge of the charge, they waived opposition to it,
    reached an accord and satisfaction with Cingular, ratified the charge or are estopped from asserting claims. Proving
25  these defenses will require Cingular to present individualized evidence on each renewing customer's experience.
    [16] Additionally, Mr. Riensche's invoices listed the surcharge differently than those received by customers from June
26  2002 through February 2004. *See generally* Lindsey Decl.
    [17] This is different from *Hesse*, in which Judge Coughenour certified a class although one named plaintiff had
27  independent knowledge about the B&O tax. Mr. Riensche is atypical for the additional reasons that he received
    different disclosures than other customers, and failed to review any of the disclosures, ask questions or complain.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -21-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

1    and by the class representatives." *Smith*, 2 F. Supp. 2d at 1343 (citing *Nat'l Ass'n for Mental*

2    *Health, Inc. v. Califano*, 717 F.2d 1451, 1458 (D.C. Cir. 1983)). The adequacy requirement

3    consists of two separate inquiries. First, the representative plaintiffs must not possess interests

4    antagonistic to the interests of the purported class. Second, the plaintiffs must be represented by

5    counsel of sufficient diligence and competence to fully litigate the claims. *Local Joint Exec. Bd.*

6    *of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir.

7    2001).[18]

8            In protecting the absent class members' rights, courts require class representatives to be

9    more than simply a surrogate for the plaintiffs' attorney. When the named plaintiffs "have

10   abdicated any role in the case beyond that of furnishing their names as plaintiffs," the attorneys

11   impermissibly become the class representative. *Helfand v. Cenco*, 80 F.R.D. 1, 7-8 (N.D. Ill.

12   1977). Mr. Riensche is simply furnishing his name as plaintiff to a suit controlled entirely by the

13   class counsel.[19] Mr. Riensche is so little involved in this case that he does not recall when he

14   noticed the B&O Surcharge on any of his monthly bills. Riensche Dep. at 44-45. He never

15   cared enough about the charge to call customer care to question it. *Id.* at 45. When asked during

16   deposition whether Mr. Riensche had ever questioned the B&O Surcharge on his own, prior to

17   discussing it with counsel, Mr. Breskin directed Mr. Riensche not to answer. Riensche Dep. at

18   17-18.[20] Where class representatives have so little knowledge of and involvement in the class

19   action that they would be unable or unwilling to protect the interests of the class against the

20   possibly competing interests of the attorneys, courts have denied class certification. *See, e.g.,*

21   *Efros v. Nationwide Corp.*, 98 F.R.D. 703, 707 (S.D. Ohio 1983); *Helfand*, 80 F.R.D. at 7-8.

22

23
24   [18] Adequacy of representation requires a broader inquiry than typicality or commonality. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 (1982). "Adequate representation 'depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the
25   unlikelihood that the suit is collusive.'" *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir.1994) (quoting *Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir.1992)).
26   [19] It appears that Mr. Breskin had already devised a class action lawsuit before talking with Mr. Riensche. He had already brought the *Peck I* lawsuit and has since filed *Peck II*.
27   [20] Cingular has moved to compel additional deposition testimony from Mr. Riensche and will supplement its adequacy argument if the Court grants that motion.

1    Although Mr. Breskin argues he is qualified by experience and financial wherewithal to

2    serve as class counsel, " [c]lass action lawsuits are intended to serve as a vehicle for capable and

3    committed advocates to pursue the goals of class members *through* counsel, not for capable,

4    committed counsel to pursue their own goals *through* those class members." *White v. Imperial*

5    *Adjustment Corp.,* 2002 WL 1809084 *12 (E.D. La. Aug. 6, 2002) (citing *Berger v. Compaq*

6    *Computer Corp.,* 257 F.3d 475, 484 (5th Cir. 2001)) (emphasis added). As explained above, Mr.

7    Riensche is not pursuing this lawsuit — Mr. Breskin is.[21] Even more disturbing, Mr. Breskin's

8    other cases prevent him from adequately serving the class. Plaintiffs "must be represented by

9    counsel of sufficient diligence and competence to fully litigate the claims." *In re Rubber*

10   *Chemicals Antitrust Litig.*, 232 F.R.D. 346, 351 (N.D. Cal. 2005) (citing *Local Joint Exec. Bd.*,

11   244 F.3d at 1162. There is no assurance Mr. Breskin possesses the diligence to "fully litigate"

12   this lawsuit. Rather, Mr. Breskin could abandon this case if he finds that the *Peck* suits or any of

13   the other similar cases have sufficient traction with the Court.

14          **E.    A Class Action Would Prove Unmanageable**

15          Rule 23(b)(3) requires plaintiff to show that class treatment is superior to individual

16   trials. Class treatment would prove unmanageable here because, by trial, the case would have

17   "devolve[d] into a . . . thicket of individual claims, defying the policy of judicial economy

18   underlying Rule 23." *LaCasse*, 198 F. Supp. 2d at 1264 (quotations omitted). Mr. Riensche has

19   not proposed how the Court would manage a class based on such disparate experiences and

20   disclosures, nor has he explained how class treatment would be the superior method for trying

21   the claims. His only logic appears to be that the claims are small, so the Court should try them

22   together. This is not enough to justify the management problems inherent in proceeding as a

23   class.[22]

24   ─────────────────

25   [21] As one Court recently noted in circumstances where attorneys "went in search of a plaintiff . . . [t]o grant class
certification in such circumstances would be to place this court's imprimatur on litigation practices which it finds

26   abhorrent and inconsistent with the standards of federal class action suits." *Bodner v. Oreck Direct, LLC*, 2007 WL
1223777, *2 (N.D. Cal. Apr. 25, 2007).

27   [22] Mr. Riensche argues that because Judge Coughenour granted class certification in a B&O Tax case against Sprint,
that this Court must certify a class as well. As explained above, the disclosures, evidence and circumstances here
are much different than those in *Hesse*.

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -23-
34001-521 \ 270280.doc                                                    **STOKES LAWRENCE, P.S.**
                                                                          800 FIFTH AVENUE, SUITE 4000
                                                                          SEATTLE, WASHINGTON 98104-3179
                                                                          (206) 626-6000

1    Moreover, Fed. R. Civ. P. 23(c)(2)(B) requires the "best notice practicable including

2    individual notice to all members who can be identified through reasonable effort" for a Rule

3    23(b)(3) class. The plaintiff typically bears the burden of paying for, and providing, notice. *See*

4    *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 359 (1978); *In re Victor Techs. Sec. Litig.*,

5    792 F.2d 862, 865 (9th Cir. 1986). Mr. Riensche ignores this crucial management issue

6    altogether and fails to offer any plan for identifying and notifying the class, much less paying for

7    the notice. This provides yet another reason why the Court should deny class certification.

8                              ## IV.  CONCLUSION

9           The facts and law in this case simply do not lend themselves to class treatment. The

10   individual class members cannot try their claims, and Cingular cannot fully assert its defenses,

11   on uniform evidence presented in a statewide class trial. There are too many differences that

12   would require the Court to slice the class into too many segments for any meaningful,

13   manageable and efficient trial. Moreover, Mr. Riensche, who refused to read any Cingular

14   disclosures, is not typical of the proposed class, nor is he or his counsel adequate for the task.

15   Cingular respectfully requests that the Court deny the motion for class certification.

16         DATED this _27th_ day of July 2007.

17                                                STOKES LAWRENCE, P.S.

18

19                                           By: _____

20                                                Scott A.W. Johnson (WSBA #15543)
                                                  Shelley M. Hall (WSBA #28586)
21                                                Bradford J. Axel (WSBA #29269)
                                                  Attorneys for Defendants
     File No.:  34001-521

22

23

24

25

26

27

DEFENDANTS' RESPONSE TO MOTION FOR CLASS CERTIFICATION
- C06-1325 TSZ -24-
34001-521 \ 270280.doc

STOKES LAWRENCE, P.S.
800 FIFTH AVENUE, SUITE 4000
SEATTLE, WASHINGTON 98104-3179
(206) 626-6000

DISCLOSURE LANGUAGE IN CINGULAR DOCUMENTS OVER TIME
RE CHARGES OR SURCHARGES OR B & O SURCHARGE

REDACTED

| Production No. | Date | Description | Disclosure Language | Location in Record |
|---|---|---|---|---|
| **Terms and Conditions  or  Terms of Service Booklets** | | | | |
| 544-559 | 2004 | Cingular Wireless Terms of Service Booklet | Charges include....regulatory cost recovery and other surcharges....and applicable taxes and governmental fees, whether assessed directly upon you or upon Cingular. To determine your primary place of use ("PPU) and which jurisdiction's taxes and assessments to collect, you are required to provide us with your residential or business street address. | Lamont Declaration, Ex. A |
| **Wireless Service Agreements - Retail** | | | | |
| 902 - 903 | 08/02 | Wireless Service Agreement (retail / dealers - customer signature version) Terms and Conditions on the back of the agreement. | "Charges include. . .applicable taxes and governmental fees, whether assessed directly upon you or upon Cingular. Cingular may add its own charges to those charged by third parties." "The prices for service on the front of this Agreement do not include applicable taxes, fees, surcharges or assessments Cingular may add to your bill and you agree to pay such applicable taxes, fees, surcharges or assessments." | Bryant Decl., Ex. B |
| 930-31 | 11/03 | Wireless Service Agreements (retail / dealers) | Front page: Cingular imposes the following charges: a Regulatory Cost Recovery Fee...a gross receipts surcharge, and State and Federal Universal Service charges. | Bryant Decl., Ex. B |
| 496 - 497 | 4/04 | | Back page: "Charges include. . . network or other surcharges.....applicable taxes and governmental fees, whether assessed directly upon you or upon Cingular. You agree Cingular may add its own charges to those charged by third parties." | |

34001-5211 REDACTED 274548 (2).doc
7/21/07 10:44 AM

| | | | | |
|---|---|---|---|---|
| 933 | 05/05 | Wireless Service Agreements (retail / dealers) - front page only | Cingular also imposes the following charges:.. a Regulatory Cost Recovery Fee...a gross receipts surcharge, and State and Federal Universal Service charges. | Bryant Decl., Ex. B |
| **Rate Plans** | | | | |
| 859 - 860 | 04/02 | Cingular Home Calling Plan brochure California / Nevada (map includes WA) | Terms applicable to Cingular Home Plans: Prices do not include taxes, directory assistance, roaming, universal service fees and other exactions. | Bryant Decl., Ex. C |
| 912 - 913 | 06/02 | Cingular Nation Calling Plan | Terms applicable to Cingular Nation Plans | Bryant Decl., Ex. D |
| 377-378 487- 493 | 04/03 to 2/06 | Assorted Rate plans covering the Pacific Northwest and Nation | "Calls subject to ...a gross receipts surcharge or other charges, which are subject to change.....Prices do not include taxes.....or other exactions." "Cingular also imposes the following charges:  a gross receipts surcharge . . ." | Lamont Decl., Ex. B |
| **Customer Care resources / trainings CONFIDENTIAL** | | | | |
| 536-542 | 3/04 | Cingular Service Summary - Job Aid | Credits, Adjustments & Other Charges State Gross Receipts Surcharge | Lamont Decl., Ex. C – **CONFIDENTIAL** |

34001-521\REDACTED 274548 (2).doc
7/27/07 10:44 AM

| 861-862 | 5/04 | Intranet information regarding B&O surcharge | State Business & Occupation Tax (B&O) | Bethel Decl., Ex. A - CONFIDENTIAL |
|---|---|---|---|---|
| | | |  | |

## Customer Service Summaries

| | | | | |
|---|---|---|---|---|
| 869-872 | 05/04 | Customer Service Summary (4 page version) | The estimates below are based on the highest tax/fee/surcharge rates assessed in your state; actual taxes/fees/surcharges may vary.<br><br>Credits, Adjustments & Other Charges<br>State Gross Receipts Surcharge:<br><br>Cingular imposes....a gross receipts surcharge | Lamont Decl., Ex. D |
| 890 - 891 | 10/06/2005 | Customer Service Summary (2 page version) | Credits, Adjustments & Other Charges<br>State Gross Receipts Surcharge:<br><br>Cingular imposes....a gross receipts surcharge....These fees are not taxes or government required charges.<br><br>The estimates above are based on the highest tax/fee/surcharge rates assessed in your state; actual taxes/fees/surcharges may vary.<br><br>Visit www.cingular.com/customer_service/additional_charges for actual state percentages. | Lamont Decl., Ex. E |