```
 1                   UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
 2                            IN SEATTLE

 3    ----------------------------------------------------------------

 4    NATHAN RIENSCHE,                    )
                                          )
 5                      Plaintiff,        )  No. C06-1325TSZ
                                          )
 6          v.                            )
                                          )
 7    CINGULAR WIRELESS LLC,              )
                                          )
 8                      Defendant.        )
                                          )
 9                                        )
      ----------------------------------------------------------------
10

11                   MOTION FOR SUMMARY JUDGMENT

12
      ----------------------------------------------------------------
13

14              BEFORE THE HONORABLE THOMAS S. ZILLY

15

16                      September 25, 2007

17
      APPEARANCES:
18
      For the Plaintiff:        David Breskin
19                              and
                                Roger Townsend
20                              Breskin, Johnson & Townsend
                                Attorneys at Law
21
      For the Defendant:        Scott Johnson
22                              and
                                Shelley Hall
23                              Stokes Lawrence
                                Attorneys at Law
24

25
```

1     THE COURT:  Will the clerk please call the calendar?

2     THE CLERK:  C06-1325Z, Nathan Riensche versus Cingular

3  Wireless Cingular Wireless.  For the record, counsel, would you

4  please stand and make your appearance?

5     MR. BRESKIN:  Your Honor, I am David Breskin.  I am here

6  for the plaintiff.

7     THE COURT:  Mr. Breskin, how are you this morning?

8     MR. BRESKIN:  Very well.  I am here with my partner

9  Roger Townsend to my right.

10    MR. TOWNSEND:  Good morning, your Honor.

11    MR. BRESKIN:  And with the plaintiff, Nathan Riensche.

12    THE COURT:  Good morning.

13    MR. JOHNSON:  Good morning, your Honor.  I am Scott

14  Johnson on behalf of the Cingular.

15    MS. HALL:  And Shelley Hall also here on behalf of

16  Cingular.

17    THE COURT:  This matter comes before the Court on a

18  variety of motions.  And we are going to hear oral argument this

19  morning.  The motions are of three types.

20    First, there is a motion to seal.  I don't think that was

21  really objected to by plaintiffs.  The defendant made the motion.

22  And the Court will grant the motion to seal documents.  That's

23  docket number 92.

24    So what we have left then is the defendant's motion for

25  summary judgment, docket 43, and the plaintiff's cross-motion for

1    partial summary judgment, 57.  I am going to hear argument first

2    on that.  And then when we finish with that we will move to the

3    plaintiff's motion for class certification, which is docket 45.

4        What I would like to do is have about 20 minutes of argument

5    per side on the summary judgment motions.  We may take a little

6    bit more time, but not more than a half hour per side, depending

7    on how many questions I ask, and then we will move into the class

8    certification.

9        All right.  I am going to hear from the plaintiff first, I

10   think, on these motions.

11           MR. BRESKIN:  Thank you, your Honor.  I was not sure

12   what area in the many many pages of briefing --

13           THE COURT:  I am particularly interested in argument

14   with respect to what this contract says and what it doesn't say.

15   Then I am interested in the application of the voluntary payment

16   doctrine, which I do believe is applicable to the contract claim

17   and the unjust enrichment claim.  But it is less clear to me

18   whether it ought to apply to the statutory claim on the Consumer

19   Protection Act.  And then we have got this whole reliance issue,

20   and what you have to prove and what you have alleged that relates

21   to the Consumer Protection Act and reliance issue.  So I am

22   interested in a variety of the things that have been alleged.

23       Why don't we start with the contract?  What does it say?

24   What doesn't it say?  What is your complaint with respect to what

25   Cingular did not advise your client about?

1          MR. BRESKIN:  Fair enough, your Honor.  I brought a copy

2     of Mr. Riensche's agreement, as it was identified by Cingular.

3     And I am just going to put it on the overhead for a moment, your

4     Honor.

5          THE COURT:  You can do that, but I am going to look at

6     the print.  I have it in front of me.

7          MR. BRESKIN:  Just by way of illustration, if you look

8     at the contract it is virtually impossible for any consumer to

9     find a provision that actually talks about what they will be

10    charged.  It is a maze of fine print.  But focusing on the

11    provision itself, what we did was blow up that provision so we

12    can meaningfully talk about it.  And this is the language, your

13    Honor, that is at issue from the plaintiff's perspective.

14       Now, the first thing that should be noted about this language

15    is that it starts out by defining those charges which the

16    consumer is responsible for paying.  It states in the contract,

17    "you are responsible for paying all charges for or resulting from

18    services provided under this agreement."

19       And then it goes on --  And this is the language that we are

20    relying on, your Honor.  This is the language which defines those

21    charges which the consumer would be required to pay.  Even the

22    language that the defendant relies on follows this by giving

23    examples of charges.  But all of those examples --

24       And will you note, your Honor, at the very end the language

25    they rely on is applicable taxes.  Now, applicable --

1      THE COURT:  Just a moment.  I think everybody concedes

2  the B&O charge is not a tax.  But I think they rely on the

3  governmental fees.  So let's focus on that.

4      MR. BRESKIN:  All right.  "Applicable taxes and

5  governmental fees."  "Applicable" meaning -- when consumed in the

6  consumers favor means, if you go back to the top and it says --

7  it has to be something that is applied because it is for or

8  resulting from the services provided to you under this agreement.

9  Otherwise it makes no sense.  And that's illustrated very well by

10  the testimony of Cingular.  And I would like to show that

11  testimony to the Court.

12      THE COURT:  Before we get to the testimony of Cingular,

13  let's just follow your argument, which I generally agree with.  I

14  think we need to try and interpret the contract by what it says.

15  But why aren't these B&O charges resulting from the services

16  provided under the agreement?

17      MR. BRESKIN:  Well, for the simple reason, Cingular's

18  stated intent in charging consumers for taxes that are applicable

19  was to pass through those which were similar in form to the sales

20  tax.  Their rationale for passing through a B&O tax surcharge,

21  they stated was --

22      THE COURT:  Where are you getting this?

23      MR. BRESKIN:  From the testimony of Cingular.

24      THE COURT:  Before we get to the testimony of Cingular

25  focus on the agreement itself.  Doesn't it permit them to charge

1    for governmental fees resulting from services provided under the

2    agreement?

3         You make the argument, well, they could charge property

4    taxes, they could charge this or that, but this wouldn't relate

5    to the services provided here.  As I understand it, they charged

6    a fixed amount, they have a lot of different plans, but a fixed

7    amount, and that generates gross revenues, and gross revenues are

8    then taxed by the State with a B&O tax; isn't that right?

9         Doesn't your client every month get a bill that says B&O tax

10   charge?  Isn't it just kind of spelled out there if you want to

11   read it?

12            MR. BRESKIN:  Well, I guess there are two questions

13   there.

14            THE COURT:  There are a lot of questions.

15            MR. BRESKIN:  Let me address --  The first question, the

16   B&O tax surcharge, something like income tax, is based on gross

17   revenues, yes.  They don't charge income tax but they pass this

18   through.  Why?

19        Under Washington law, under Berg, you look at the context of

20   the contract, you look at the words they use on the page, and

21   there is no B&O tax surcharge stated as a charge, which is a

22   point that Judge Coughenour found very persuasive in the Hesse

23   case, an identical case, when they stated in fact they weren't

24   going to charge this.

25            Now you get the governmental --

1          THE COURT:  That was a class certification order?  Is

2     that what you are talking about?

3          MR. BRESKIN:  No.

4          THE COURT:  It was a motion to dismiss in Hesse?

5          MR. BRESKIN:  Yes.

6          THE COURT:  We are here at summary judgment.  We are at

7     a different level, aren't we?

8        Didn't he specifically say, with respect to the voluntary

9     payment doctrine, that he wasn't really addressing that, wasn't

10    worrying about it because it wasn't presented?

11         MR. BRESKIN:  I think we are mixing two different orders

12    now.  The motion to dismiss was brought on this very issue that

13    you asked me about, the interpretation of the contract.  They

14    submitted declarations with regard to that.  It was as much a

15    summary judgment motion as the one before the Court right now.

16       The Court was asked to interpret, by both sides, the

17    contract.  We asked to interpret it in our favor because the B&O

18    tax surcharge was not stated in the contract.  They asked the

19    Court to interpret it because there was a similar phrase to taxes

20    or governmental fees imposed on Sprint or imposed on you.

21       And in that case, like this case, the Court had to address

22    the language of the contract and the rule of interpretation

23    about -- excuse me, interpreting the contract most favorably

24    towards the consumer.  So the situation is very similar.

25       On the voluntary payment, your Honor, you are talking about

1   the classification order.  But the Court did address the

2   voluntary payment and how it applied in the context of

3   classification in the context of the claims that were asserted.

4   And can I show that to the Court as well.

5           THE COURT:  I think that is not correct, because in his

6   class certification order he expressly says that is he not --

7   that is one of the reasons he certifies, so that issue, which

8   would be common to the class, could later be sorted out.

9           MR. BRESKIN:  Yes, your Honor.  But he says, if

10  applicable to Mr. -- and the case was Mr. Hesse, if applicable to

11  Mr. Hesse's claim he would be roughly in the same position as

12  others because it would affect his right to recover for damages

13  after he knew about this charge.

14      So the Court was saying clearly, one, this was a damages

15  issue that might limit his ability to collect damages for charges

16  after he became aware of it, but that he would be in the same

17  position as others in terms of collecting damages for the period

18  before.  I mean, that was the analysis of the Court in that case.

19      You are correct that it was a class certification order.  But

20  clearly those statements relate to how this doctrine would apply

21  to the claims asserted in the case.

22          THE COURT:  Let's move on.  I am not sure I agree with

23  your analysis on what he did and didn't do.

24      If we need to look at the intent of the parties what can we

25  look at?

 1          MR. BRESKIN:  I believe under Berg what one looks at is

 2     the circumstances.  Here we have an adhesion contract imposed on

 3     consumers in which the language is drafted by Cingular.  And

 4     there is no opportunity for negotiation or change of that

 5     language.

 6          THE COURT:  You can go to a different carrier.  You can

 7     go without a cell phone.  You have lots of choices, don't you?

 8     You didn't give me anything in your briefs that I saw that would

 9     suggest this is an adhesion contract, would be unconscionable,

10     shouldn't be enforced.  That is not an issue that has really been

11     sorted out here, Mr. Breskin.

12       Can I look as part of what the parties intended what the

13     bills said when they were submitted to your client?  Would that

14     be evidence of intent?

15          MR. BRESKIN:  Well, it --

16          THE COURT:  It calls for a yes or no.

17          MR. BRESKIN:  I don't believe in this case it is

18     evidence of the intent in the agreement itself or in the language

19     of the agreement itself.

20          THE COURT:  What is it that I can look at to determine

21     intent?  You want me to look at what someone said in a

22     deposition six months or a year or two later.  Give me the

23     parameters of what a court can look at in attempting to determine

24     what the parties intended.

25          MR. BRESKIN:  Again, I believe under Berg you can look

1    at the circumstances by which the contract was formed.  And that

2    would be one thing you could look at.  And I have tried to

3    explain that not as an argument that it shouldn't be enforced

4    because of adhesion but as a statement that these are the

5    circumstances.

6        They have implications, because under Restatement of Contract

7    2nd, Section 211, what that would lead the Court to apply as a

8    rule of law is that the contract should be interpreted the same

9    way for all consumers.  That is the point.

10       The second thing, I think the Court can look at the

11   statements of the company with regard to its rationale for

12   charging or believing it can pass through to consumers this

13   charge.  So I think the Court can look at that.

14       I think the Court could also look at the circumstances about

15   whether the charges are regarded as something which falls within

16   the reasonable expectation of a reasonable consumer.  And we

17   submitted a declaration of Professor Roycroft on that point.

18       Dr. Roycroft is a noted expert on cellular phone and

19   telecommunications industry.  And he testified about the fact

20   that consumers would not reasonably expect to be charged for the

21   overhead expense of a B&O tax as a line item charge.

22            THE COURT:  That is certainly not something I should

23   look at in determining the intent of the parties in interpreting

24   a contract, is it?  What some professor says the parties must

25   have intended or meant or not meant?

1          MR. BRESKIN:  The point is, your Honor, under the law

2    the Court can look at the reasonable expectations of the consumer

3    in contracting.  That is a circumstance under Berg that you can

4    look at.

5          THE COURT:  If that is the case couldn't I look at the

6    statements that he received and the fact that it is clearly --

7    You would agree that the statements themselves on their face

8    reflect that he is being charged for B&O charge or surcharge?

9          MR. BRESKIN:  There is a B&O surcharge on the bill, yes.

10         THE COURT:  And the fact that he doesn't do anything

11   about it after he gets those statements month after month is some

12   suggestion that he intended that he would pay it; isn't that

13   right?

14         MR. BRESKIN:  No.

15         THE COURT:  We can't consider those statements?

16         MR. BRESKIN:  Clearly the Court can consider the bills.

17   But the conclusion that you are reaching is contrary to the

18   evidence.

19         THE COURT:  Cingular also argues there was available on

20   their website certain information.  Can we consider that in

21   determining the intent of the parties?

22         MR. BRESKIN:  In this case I don't believe so, because

23   the website information actually did not exist at the time of

24   contract formation with Mr. Riensche.

25         THE COURT:  So the "understanding your bill" website was

1    not available then?

2          MR. BRESKIN:  My understanding from the record is that

3    was not placed on their website until sometime in, I believe,

4    late 2005, is the testimony in the record.

5       In any case, as Mr. Peck testified in his deposition, he

6    could not locate it.  It is very difficult to locate information.

7    So, no, your Honor, I don't think that would be --

8          THE COURT:  The Supreme Court in the Berg case has said

9    that acceptance of accountings and payments over a period of time

10   should be considered an aid to determining the intent of the

11   parties.

12         MR. BRESKIN:  Yes, I believe that would be the case if

13   it was a negotiated agreement where the parties are both

14   negotiating a contract.  Then if you have a situation like that,

15   then you can say it is the, quote, mutual intent of the parties.

16   But the subjective, unilateral intent of one party is not

17   relevant to contract formation or terms of the contract.

18      So in this case, where the plaintiff is a consumer, and the

19   consumer is saying, I don't know what this charge is, and I never

20   saw it on my bill for an extended period of time, it would not

21   make any sense, your Honor, to consider that as evidence of the

22   consumer's intent.

23         THE COURT:  Is it your position that the contract on its

24   face --  What is your position?  Is it ambiguous?  Does it not

25   allow them to make this surcharge, or does it allow them but

1    doesn't give the consumer enough information.

2         MR. BRESKIN:  Initially, on its face, it doesn't state

3    it.  Secondarily, if you wanted to interpret it, a reasonable

4    interpretation, I would submit, your Honor -- the reasonable

5    interpretation of the language that they chose was that charges

6    that are for or resulting from services, including those which

7    would include taxes if they were for or resulting from the

8    services, or governmental fees if they were for or resulting from

9    the services that the consumer has under this agreement, meaning

10   your agreement --

11        So as a consumer --  I mean, to put in practical terms, your

12   Honor, as a consumer I know I have to pay a sales tax.  Everybody

13   knows that.  I know that if I use the phone a lot my sales tax is

14   going to be a lot.  I know that I can control that by the use of

15   my service.  If I don't use the phone I wouldn't be charged.

16        So from a practical standpoint it makes sense, I can control

17   what I am being charged by my use of the service.  That makes

18   sense.  But this tax has nothing to do with the use of the

19   service.  They admit that in their testimony.

20        THE COURT:  Wait a minute.  You want to say, it doesn't

21   matter whether he uses the cell phone or not, but it certainly

22   has something very directly to do with the amount of revenue that

23   is charged for the contract plan that he enters into, because

24   that is gross revenues, and gross revenues are taxed by the

25   State.

1    I am unpersuaded by your argument that this charge doesn't,

2    in the words of the contract, result from services provided under

3    the agreement.  If that is your argument I think it is not a good

4    one.

5        MR. BRESKIN:  Let me go on, your Honor.  The Supreme

6    Court of the State of Washington has expressly said that.  They

7    have said the B&O tax, unlike the sales tax, is not for service.

8    It doesn't --

9        They could have written this contract anyway they wanted,

10   your Honor.  They could have put the words in expressly, they

11   could have adopted what the Court is saying now and said other

12   words.

13       THE COURT:  What is the Supreme Court case you are

14   referring to?

15       MR. BRESKIN:  It is this case, your Honor.  Ford Motor

16   Company 160 Wn. 2d 32 at 39-40.  "Unlike a sales tax which taxes

17   specific sales of a good or service, the B&O tax is imposed on a

18   general privilege of engaging in business."

19       That is critical, your Honor, because, again, I would come

20   back to what Cingular has said, the rationale was it was like a

21   sales tax.  They were wrong.  The Supreme Court says it is not

22   like a sales tax.

23       THE COURT:  All right.  Let's move on.  We do have

24   limited time.  Fascinating issues.

25       Let's assume that they don't have the right to charge you but

1    your client in fact receives a bill and he pays.  Why doesn't the

2    voluntary payment doctrine apply in this case?

3         MR. BRESKIN:  Okay.  Let me back up.  I take it from the

4    Court's remarks that you then disagree with the Supreme Court of

5    Texas in the BMG Direct Marketing case where they held --  I

6    would just point out to the Court their expressed holding on

7    this.  This is from BMG Direct Marketing case cited in the

8    Court's minute order.  It says categorically, "in a

9    run-of-the-mill breach of contract case the voluntary payment

10   rule should not apply."

11        THE COURT:  In fact, the Washington courts and the

12   courts of almost every state in the country have applied the

13   voluntary payment doctrine, have they not, to situations for

14   breach of contract and unjust enrichment claims?

15        MR. BRESKIN:  Those are two very distinct things, your

16   Honor.  And the answer to the first is no.  The answer to the

17   second is yes, unjust enrichment and restitution are equitable

18   claims, as the Supreme Court in Texas explained.  The point the

19   Court is asking about was explained by the Supreme Court of Texas

20   in that case.

21     If you look at --  I will show the quotes to the Court from

22   that.  First, it makes notes.  It notes that "the equitable

23   claims and defenses may be rendered inapplicable where there is a

24   legal claim and remedy.  Breach of contract is a legal claim as

25   opposed to equitable."

1      So, no, your Honor.  If you carefully read those cases, and

2  most of the cases the Court cited in its minute order, are cases

3  that involve illegal fees, late fees, if the Court recalls.  And

4  in those cases, if you read those cases carefully, you will see

5  that the claims that are being made in those cases are for

6  restitution of an illegally charged fee.  And, in fact, in those

7  cases the contract said you would be charged a late fee.

8          THE COURT:  Didn't the Supreme Court of Texas in Dallas

9  County versus Bolton in 2005 recognize and prove the voluntary

10  payment doctrine in a breach of contract context?

11          MR. BRESKIN:  Your Honor, I am shot sure of the cite of

12  the Bolton case.  I did look at the case the Court cited --

13          THE COURT:  It is found at 185 Southwest 3d 868.  It is

14  a 2006 case, decided after BMG that you are referring to.

15      And the BMG Direct Marketing case, as I read it at Page 10 of

16  my Westlaw print out.  They say, "the split of authority is

17  mostly one-sided.  Indeed the courts of appeals stand almost

18  alone.  With one exception, courts in almost every other

19  jurisdiction have applied the voluntary payment rule to late fee

20  like the one here."

21          MR. BRESKIN:  Yes, your Honor.  Again, if you look at --

22  I would submit, your Honor, the most careful analysis of

23  voluntary payment doctrine is found in two cases the Court cited.

24  This one, BMG Direct, and the other is the Whiteman case, the

25  Indiana Supreme Court case.

1    If you look at the claim that was being made here, in fact

2    the Court says as much in that first quote, that --  Let me bring

3    that back, your Honor.  The Court differentiates.  It says, the

4    claim that the plaintiff is making is not breach of contract.

5    What it says is, he alleges an illegal penalty has been assessed.

6    His refund suit is restitution for unjust enrichment.  That is

7    the claim.  That is not the breach of contract claim in this

8    case.  It is a run-of-the-mill breach of contract.

9         THE COURT:  Don't you think the vast majority of the

10   courts have addressed it, including the State of Washington, and

11   have applied it in the breach of court context?

12        MR. BRESKIN:  Let's look at the State of Washington.  I

13   have looked at every case in which the words "voluntary payment"

14   appear.  Your Honor, there has not been a single case in the

15   State of Washington that I could find that applied this doctrine

16   to any claim, let alone a contract claim, in the last like 50

17   years.

18   And the last reported case that I saw, which did not apply

19   it, was an insurance case.  And I know the Court is very familiar

20   with insurance coverage cases.  And those cases are very

21   distinct.  And generally the rule of law, at least in the last 30

22   years, has been that insurance companies who voluntarily pay a

23   claim are not barred by the doctrine of voluntary payment.

24   So the most recent history of Washington State suggests that

25   it doesn't really apply to contract claims, and hasn't been

```
 1   applied.

 2       In the context of older Washington cases, there are older

 3   Washington cases that provide no analysis whatsoever and have

 4   applied the doctrine with regard to, again, claims for recovery

 5   of payments that have been made, without any analysis or

 6   discussion.

 7           THE COURT:  You may not like the fact that they didn't

 8   discuss it much but perhaps they didn't need to.  But I have got

 9   a string of Washington cases that all say the same thing, absent

10   fraud, duress or extortion, Washington follows the voluntary

11   payment doctrine.

12           MR. BRESKIN:  I know, your Honor.  But if you look

13   closely at those cases and the claims being made in those cases,

14   invariably they are cases that sound on the unjustness of the

15   defendant retaining the payment that was made by the plaintiff.

16   And the rejoinder to that is, the defendant coming back and

17   saying, well, yeah, but you voluntarily paid it.  So there is a

18   weighing of the equities when voluntary payment is involved.  And

19   that doesn't occur in this contract.  That is the distinction.

20           THE COURT:  I am unpersuaded by your argument that there

21   is a distinction there.  I think it either applies or doesn't

22   apply.  Just for purposes of the record, you are conceding that

23   it applies in the unjust enrichment context here?

24           MR. BRESKIN:  Yes.

25           THE COURT:  Let's move on to what I think is the more
```

1  difficult issue, and that is its application, if any, in the

2  statutory claim for Consumer Protection Act.  What do the cases

3  say there?

4       MR. BRESKIN:  Again, the Washington --  Well, first of

5  all, again, the BMG case discusses statutory claims, and says it

6  does not apply where there is a statute that confers the right.

7  This makes a lot of sense, your Honor, because the legislature

8  determines what it are the rights of the consumer in this case.

9       And Washington courts have held, for example, that statutes

10  dealing with payment of fees or taxes where the statute itself

11  does not contain an obligation to make protest first.  The rule

12  of law is the Courts cannot impose one, because that would be

13  virtually rewriting the will of the legislature.  And the statute

14  requiring an obligation, the legislature itself said, did not

15  need to be placed on the rights of the person under the statute.

16  So you have that authority.

17       You have no authority, that I have ever seen in the State of

18  Washington, that has applied the voluntary payment doctrine to a

19  Consumer Protection Act claim.  There is no such authority.  It

20  is inconsistent, as we pointed out --

21       THE COURT:  What have other courts done?  I don't think

22  there is a case in Washington that really addresses that

23  specifically.  Other courts, where they have applied the

24  voluntary payment doctrine to contract and/or unjust enrichment,

25  have they applied it in the Consumer Protection Act context?

1     MR. BRESKIN:  They have not, your Honor.  You have to

2  read the cases very carefully.  One of the cases, I believe it is

3  the Dreyfus case in Illinois, discussed voluntary payment, but it

4  dismissed the consumer fraud claim because the plaintiff had not

5  pled in a state of fraudulent misrepresentation, which is

6  required under their statute.  So that didn't really address the

7  issue.

8     Again, one has to be very careful about imposing this

9  doctrine from another state to begin with.  To give you another

10  example, in another one of the cases it was pointed out that

11  voluntary payment is actually a statutory defense, not a

12  common-law defense.  In Washington it is not a statutory defense.

13  When you have a statutory defense other considerations would

14  apply.  You have to be very careful in looking at those cases.

15     THE COURT:  Mr. Breskin, I always try to be very

16  careful.

17     MR. BRESKIN:  I wasn't implying you weren't, your Honor.

18     THE COURT:  Let me suggest, my careful review of Smith

19  versus Prime Cable of Chicago, an Illinois case, and Putnam

20  versus Time Warner, a Wisconsin case, both dealt with Consumer

21  Protection Act cases.  Both cases, I believe, held that the

22  voluntary payment doctrine did not apply in an analogous type of

23  Consumer Protection Act claim.  How do you respond to those

24  cases?

25     MR. BRESKIN:  Again, your Honor, I believe the first

1   one -- if you look carefully at that case, I believe the court

2   dismissed that based on the fact that the plaintiff failed to

3   plead the necessary elements of the claim.

4       With regard to the Putnam case --

5           THE COURT:  You are saying the Smith case or the Putnam

6   case?

7           MR. BRESKIN:  The Illinois case, your Honor.

8           THE COURT:  That is the Smith case.  The Smith case held

9   that there were no damages for that Consumer Protection Act claim

10  because of the voluntary payment doctrine.  It applied that

11  doctrine to that case.

12          MR. BRESKIN:  The Smith case, your Honor?

13          THE COURT:  Yes.  I think the Putnam case is the one you

14  are referring to where the court noted the customers failed to

15  allege any duty to disclose.

16          MR. BRESKIN:  I think I was referring, frankly, your

17  Honor, to the -- it is the Dreyfus case that I was referring to,

18  which is the Illinois case that was cited in your minute order.

19  Again, this is Page 6 of the Lexis printout.  "We find that

20  plaintiffs have failed to allege the necessary false statement of

21  material fact."  And then they affirm dismissal on that ground.

22      With regard to Putnam, Putnam was the case that was

23  criticized by the Indiana Supreme Court in Whiteman.

24      This leads to another issue, your Honor.  These cases that

25  have adopted the voluntary payment defense, again, are ones which

1  rest on a distinction between a material -- a mistake or a

2  material issue of fact and a material issue of law, which was

3  adopted from the Restatement -- well, the ALI statement of

4  restitution from 1937.

5      As the Indiana Supreme Court makes clear in its opinion in

6  Whiteman, that is not the modern view.  The modern view of

7  scholars is that there is no distinction that should be made

8  between a mistake of law and fact.  So, again --

9              THE COURT:  What is it that we have here?

10             MR. BRESKIN:  Well, our Supreme Court has not said --

11             THE COURT:  What are you claiming?  Are you claiming it

12  is a mistake of fact or a mistake of law?

13             MR. BRESKIN:  I think it is both, because I think the

14  distinction is, as the Indiana Supreme Court makes clear, it is

15  completely artificial.

16     I would just point out, your Honor, the only statement we

17  have in the Washington Supreme Court that even kind of addresses

18  this issue was the statement they made in the Haberman/WPPSS

19  case, in which they said we are adopting the Restatement,

20  Section 151, that has to do with, for purposes of contract claims

21  and contract formation, if there is a mistake of law that is

22  sufficient to undo the contract.  And if you recall, in that case

23  they allowed the bondholders to escape liability based on that.

24     So the Washington Supreme Court has not said.  The modern

25  direction is clearly in that direction.  The only indication we

1   have is that the Washington court seems to adopt that concept, at

2   least in the context of contract formation.  But there is no

3   other statement we have from the Washington court on that.

4          THE COURT:  Tell me, do you contend that the defendant

5   failed to disclose something or made a misrepresentation of fact?

6          MR. BRESKIN:  It is a failure to disclose situation,

7   your Honor.  It is akin to --  It is identical to the Hesse case.

8   It is identical really to the Schnall case, which is the most

9   recent pronouncement from the appellate court of the State of

10  Washington on cases of this nature.

11         THE COURT:  The Schnall case is troubling, because I am

12  not entirely sure they got it right.  Am I required to follow it

13  if I conclude that --  The Supreme Court later kind of beat up on

14  that Court of Appeals and its decision, did it not?

15         MR. BRESKIN:  Your Honor, frankly, I think you have the

16  chronology a little bit off.

17         THE COURT:  It is possible.

18         MR. BRESKIN:  What happened was in Picket I, the

19  Washington Court of Appeals was asked to address causation and

20  damages under the CPA in the context where the consumers had paid

21  this port fee that was not disclosed.

22      The Court of Appeals --  All right.  So the case gets

23  settled.  The trial court approves the settlement.  The Court of

24  Appeals vacates the settlement.  It says, you have to go back to

25  the drawing board because we are not convinced the settlement was

1   reasonable.

2        The Washington Supreme Court reverses.  It says, you

3   shouldn't have disapproved of the trial court's discretionary

4   judgment to approve this settlement as reasonable.  In passing it

5   says, one of the issues that was raised was whether individual

6   reliance was necessary.  And the Supreme Court says, we have

7   never spoken on that subject matter.

8        Now we get to Schnall.  Schnall was a decision by the same

9   appellate court.  They looked at the Picket decision.  They

10  looked at what the Supreme Court had said in Picket.  And they

11  have said categorically, your Honor, that the Supreme Court did

12  not reverse or disapprove their statement.  And that is the law

13  of the State of Washington.

14       Now, you could take comfort in the fact that this Court has

15  already passed judgment on Schnall.  In the recent case --  Let

16  me get that for the Court.  This Court found Schnall to be the

17  law of the State of Washington.  Let me put that up.  This is the

18  decision of the Court in Blaylock versus First American Title

19  Insurance Company.  It was just entered in that case.

20            THE COURT:  Refresh my memory, is that my opinion or one

21  of the others?

22            MR. BRESKIN:  No, it is Judge Robart's, I believe,

23  opinion.  As you can see, agreeing with Schnall and citing to

24  Schnall he reaches that conclusion.

25            THE COURT:  Well, you will be happy to know we don't

1  always agree.

2          MR. BRESKIN:  Yes, I am very familiar with that.  But I

3  would also point out that is not the first time this Court has

4  addressed this very issue.

5      In addition to Blaylock, Judge Bryan addresses this very

6  issue in the Pierce versus Novastar Mortgage Company case.  That

7  is found at 238 FRD 624.  There is a rather lengthy part of the

8  decision in which he talks about the CPA elements.  This came out

9  in 2006 before Schnall.

10     What Judge Bryan says in this decision, the Court is aware of

11  no Washington authority explicitly holding that causation under

12  the CPA requires proof of reliance on omission.

13     And then it goes on to discuss its reasoning.  It goes on to

14  say, it is difficult to conceive of how a plaintiff may be

15  expected to affirmatively show reliance on an omission, other

16  than through the filing of self-serving affidavits.

17     In this regard the Court is persuaded by the rationale in

18  Morrison versus International Yogurt.  And then it discusses that

19  rationale.

20     And this is important, your Honor, because, again, the Court

21  was dealing there with a motion for class certification, and

22  certified a class in that case.

23          THE COURT:  But the Court goes on to say -- first it

24  says, "at this stage."  Was there a motion to dismiss or was it

25  just strictly a class certification motion?

1        MR. BRESKIN:  This was a motion for class certification.

2    There was a subsequent order.

3        THE COURT:  But Judge Bryan goes on to say, "whether the

4    plaintiffs will succeed in proving causation through other means

5    is an issue not now before the Court."  How is it that you are

6    going to prove causation?  Are you suggesting you don't have to

7    prove causation?

8        MR. BRESKIN:  Again, I was trying to book end for the

9    Court --  Well, the answer is obvious.  We have to prove

10   causation.

11       THE COURT:  How are you going to do that?

12       MR. BRESKIN:  In the manner that Schnall and Blaylock

13   suggests, the payment of money to the defendant for this fee that

14   was not disclosed at the time of contract formation.

15       And, again, your Honor, I would point out that Washington on

16   the CPA claim --

17       I mean, there is case law that is pretty analogous.  The

18   Nelson versus National Fundraising Consultants case at 120 Wn. 2d

19   382.  That is a Washington Supreme Court decision.  It is a

20   somewhat analogous situation.  I think even a tougher case for

21   the plaintiff in that case.

22       In that case the defendant disclosed to the consumer that

23   there would be a mark up on the goods but failed to disclose it

24   was 20 percent.  And so when the consumer found out it was

25   20 percent they sued under the CPA saying, you didn't disclose

 1   this before contract formation.

 2       The Court said, even though the plaintiff appeared to have

 3   discovered or learned the precise percentage of the mark up,

 4   disclosure of contracts in terms to be meaningful must occur

 5   before contract formation, not after the parties have become

 6   contractually bound.  Because the disclosure, at least as to the

 7   precise content, of the mark up occurred only after the contract

 8   was formed, the defendant cannot rely on disclosure to insulate

 9   himself from the charge of violating the act of the CPA.

10       So there is a nondisclosure in our case.  They didn't

11   disclose the fee to Mr. Riensche or other consumers.  In fact,

12   they state that their general practice is not to disclose those

13   line item charges.

14       In an omission case or failure to disclose case, Schnall --

15   Blaylock is consistent with Schnall in saying, you can prove that

16   by showing that you paid the charge and they didn't disclose it

17   prior to contract formation.  That's how we would prove causation

18   and damages.  And the damages are self-evident, it seems to me.

19   It is the amount that they charged.  And those are reasonably

20   calculated.

21           THE COURT:  Thank you.  I think we have spent enough

22   time on the issues.  Let's hear from the other side.

23           MR. BRESKIN:  Your Honor, if I might make one last

24   point?  I would just point out, your Honor, again going back to

25   this voluntary payment doctrine concept and why it is a difficult

1   one to apply, not only because of the passage of time and

2   different rules in different states.  I would only point out in

3   the State of New York, for example --  This is the statement of

4   the highest court in the State of New York about voluntary

5   payment.

6       In Laconti versus City of Utica it embraces the concepts that

7   we are trying to get across here.  First of all, what does full

8   knowledge mean.  It means that, at the very least, you knew there

9   was no liability to pay, that it ought not to be paid.  And it

10  doesn't affect the right of the payer to recover because the

11  mistake arose from want of care on his part.  That is a statement

12  of the rule of law for voluntary payment by the highest court of

13  the State of New York.

14      Now, one of the cases I noted that you cited in your minute

15  order was also from the State of New York.  Again, you may not

16  like the result, but there was no analysis in that case

17  whatsoever other than to say that --  Again, this was an illegal

18  fee case.  And the only thing the court pointed to was the fact

19  that it was in the contract that you have to pay this fee.  And

20  the plaintiff didn't dispute that.  We don't have that here in

21  our case.

22      But, again, what I am trying to illustrate to the Court is,

23  if full knowledge means this, there is no evidence in this record

24  to support the defendant's burden of proving that affirmative

25  defense.

1          THE COURT:  Thank you.

2          MR. JOHNSON:  Good morning, your Honor.  Let me take a

3   minute to just review with you what are the undisputed facts.  It

4   is undisputed that Mr. Riensche is a certified public accountant

5   and has a Masters degree in professional accounting; that he

6   specializes in taxes, and that for years he handled the B&O taxes

7   for the Seattle Times, years before he signed up with service for

8   Cingular.

9          He has testified that he knew what the B&O tax was, what it

10   is, and he defined it himself as a gross receipts tax.

11          He is also a punitive class representative in another case,

12   the Schnall case, in which he is suing AT&T Wireless Services,

13   one of the predecessors to Cingular.  He is represented in that

14   case by the same counsel.

15          He has asserted in that case that AT&T Wireless Services

16   breached its contract with customers and violated --

17          THE COURT:  You are going too fast, counsel, if you wish

18   to have it reported.

19          MR. JOHNSON:  I will slow down.  He breached his -- he

20   claims that he has breached -- that AWS breached its contract

21   with the consumers and violated the Consumer Protection Act by

22   charging a universal connectivity charge.

23          Mr. Riensche signed up for services in April of 2004 through

24   Cingular's E-store.  He admits that he knew that there would be

25   additional charges in addition to the base rate that he was

1    signing up for.  In fact, the website that he used explained what

2    those additional charges were.  He had --

3              THE COURT:  Just a minute.  I had understood that

4    Mr. Breskin was suggesting that website that I referred to wasn't

5    up and running at that time.  Is there a dispute on that?

6              MR. JOHNSON:  Yes, there is, your Honor.  Mr. Breskin is

7    confusing the evidence that is presented in connection with the

8    class certification motion that demonstrates the changes to the

9    website.

10       What was the website in April of 2004 when Mr. Riensche

11   signed up?  One of the pages -- one of the features on the

12   website was --  And this is a printout of that page from the

13   website.

14             THE COURT:  Where do I find it in the record?

15             MR. JOHNSON:  It is an exhibit to the Hall declaration.

16   I believe it is Exhibit C.

17             THE COURT:  All right.  I have Exhibit C.  It is not C.

18             MR. JOHNSON:  It is D.  Paragraph 7 of Ms. Hall's

19   declaration says that the archived copy of the website includes

20   the section called, "understanding your bill."

21             THE COURT:  Just a moment.  Mr. Breskin, is there some

22   factual issue on whether that "understanding your bill" was up

23   and running when he applied for this phone?

24             MR. BRESKIN:  No, your Honor, as to that form.  What I

25   was saying was, the discussion about the B&O tax surcharge, which

1    is another part of the website, did not go up on their website

2    until 2005.

3              THE COURT:  Perhaps I misunderstood what you were saying

4    or perhaps I didn't word my question properly.  This

5    "understanding your bill" was up and running at that time?

6              MR. BRESKIN:  I believe so, your Honor.  But it is not

7    different than other forms I have seen in the case.

8              THE COURT:  I think you have answered the question.

9              MR. JOHNSON:  Had Mr. Riensche looked at this website,

10   your Honor, had Mr. Riensche, prior to signing up for service,

11   taken the time to review the web page called "understanding your

12   bill", had he had any questions about "what does it mean, credit

13   adjustments and other charges", he could have clicked on the icon

14   next to that, and this popup box would show.  And the popup box

15   says, "this section --" meaning credits, adjustments and other

16   charges, "this section lists the credits and/or charges for

17   services, fees and other special charges when they apply.  Your

18   activation fee will also be listed here."

19             THE COURT:  Why do I need to do that?  I am applying for

20   a cell phone, and I go on line, and you say, here is the

21   contract; and I say, okay, I have read the contract, I will buy

22   the contract.  Why do I have to go on the website to understand

23   and find something that you don't have in the contract?

24             MR. JOHNSON:  Your Honor, the contract says that charges

25   include, without limitation, among other things, network and

1    other surcharges.  So if Mr. Riensche bothers --

2         THE COURT:  Just a moment.  I read that, "network and

3    other surcharges", to be some sort of surcharges relating to

4    network matters.  I don't know what that means.  You are now

5    saying the B&O charges come in under that network and other

6    surcharges?

7         MR. JOHNSON:  Yes, sir.

8         THE COURT:  You are not relying on applicable taxes and

9    government fees then?

10        MR. JOHNSON:  No, sir.

11        THE COURT:  All right.

12        MR. JOHNSON:  The B&O surcharge is a surcharge.  That is

13   what is referred to there.  And had Mr. Riensche gone to the

14   "understanding your bill", under the section called "credits,

15   adjustment and other charges" he would have seen that it includes

16   gross receipt surcharges are in this section.

17        THE COURT:  Again, you say if he had gone there.  Why

18   did he have to go there?  This is the contract.  Could he not

19   apply for this contract, say, yes, I have read the terms, yes, I

20   accept, and be given the contract and the phone?

21        MR. JOHNSON:  He absolutely could, your Honor.

22        THE COURT:  All right.  So is it --

23        MR. JOHNSON:  But your question was --

24        THE COURT:  My question is, where in this contract,

25   which is the only thing I am going to look at and accept, does it

1    say that B&O charges are going to be charged to me?

2            MR. JOHNSON:  The contract doesn't use the words "B&O",

3    or the letters or initials or the acronym "B&O."  What it uses is

4    the term "network and other surcharges."

5        Your Honor, you were focused on what else could I look at to

6    interpret the meaning of this contract under Berg.  I think you

7    can look at the website that was available to Mr. Riensche, which

8    he didn't bother to review, that clearly spelled out that the

9    other surcharges includes a gross receipt surcharge.

10           THE COURT:  All right.  So let's go to that website just

11   so I have it in focus.  Why don't you put it up again?  I can't

12   read that, so you better read it to me.

13           MR. JOHNSON:  I apologize, sir.  This is the first page

14   of the website.  To the left of the "credits, adjustments and

15   other charges" is an icon that you can click on that brings up

16   the popup box.  Again, your Honor, this is the website that was

17   available at the time that Mr. Riensche signed up for services.

18           THE COURT:  Let's just get it straight now.  When I go

19   to this, "understanding your bill", there is nothing about B&O

20   charges here on the face page; is that right?

21           MR. JOHNSON:  No, there is nothing about B&O.

22           THE COURT:  How do I get this popup now?

23           MR. JOHNSON:  Click on the icon that is to the left of

24   the "credits, adjustments and other charges."

25           THE COURT:  You would agree it is not in this first

1    page, I have to click on yet another icon to pull up this

2    explanation?

3            MR. JOHNSON:  You are right, your Honor.  You will have

4    had to look at other pages in the website to familiarize yourself

5    if you had other questions about the agreement as well.  I mean,

6    there is no --  You are right, you would have to click to get to

7    this explanation.  It is two clicks away.

8            THE COURT:  I am up at the top of this thing.  As I

9    understand it, it says "understanding your bill."  Well, I am

10   just signing up for the contract.  I haven't got a bill yet.  Why

11   would I go into this to try an understand my bill when I am

12   signing up?

13      It says, "to learn more about the pieces of information that

14   make up your monthly bill roll your mouse over the bill display

15   and a popup window with more information will display each part

16   of the bill."  Well, I haven't got a bill yet.  I am just signing

17   up for this cell phone.  Why would I be looking at some bill I am

18   going to get in a month or two?

19           MR. JOHNSON:  Your Honor, you are different that

20   Mr. Riensche.  You are not a CPA.  You are not a tax specialist.

21   You are not a punitive class representative in another case.  You

22   are not one who would know that there is other information

23   available, but you could have.  If Mr. Riensche --

24           THE COURT:  You are suggesting now that somehow this

25   plaintiff has super information, knowledge and background, and

1    that the ordinary customer signing up on your contract wouldn't

2    understand there would be a surcharge?  Is that where that leads?

3              MR. JOHNSON:  That is not what I am suggesting, your

4    Honor.

5              THE COURT:  That is what it sounds like.

6              MR. JOHNSON:  What I am suggesting, if you are signing

7    up for a contract, and you see the contract, you have the right

8    to read the contract, you read the contract, you click on the "I

9    accept the contract."  If you are signing up through the website

10   there is a host of information that is available that further

11   explains the terms of that contract.  And if you had questions

12   you would have gone to two clicks, and you would have known that

13   there is a gross receipts surcharge on your bill.

14             THE COURT:  Read me the second -- what I get on that

15   popup window.  Read it into the record because I can't read it.

16             MR. JOHNSON:  It has a title.  I will again with that.

17   "Credits, adjustments and other charges."  It then says, "this

18   section lists the credits and/or charges for services, fees or

19   other special charges (when they apply).  Your activation fee

20   will also be listed here.  The regulatory cost for covered

21   charge, regulatory program charge, universal fund fee and gross

22   receipts surcharge are in this section."

23             THE COURT:  I am just an ordinary customer signing up.

24   I didn't hear anything about B&O tax.

25             MR. JOHNSON:  But Mr. Riensche knows that the B&O tax is

1    a gross receipts tax.

2          THE COURT:  Would the ordinary consumer know that, what

3    is a gross receipts tax?

4          MR. JOHNSON:  Your Honor, I don't know if an ordinary

5    consumer would know that.  I believe that there is lots of

6    consumers who knows that.  I know that Mr. Riensche specifically

7    knows that.  I can't talk about -- I would think that there are a

8    wide variety of consumers that would know, and a wide variety of

9    consumers that may not know.

10      But there is a second layer, your Honor.  And that is, when

11   Mr. Riensche got his first bill, at the time that he got his

12   first bill he still had the right to terminate his services.  He

13   got the bill and the bill says --  This is a copy of his first

14   bill.

15         THE COURT:  Just a moment.  Refresh my memory where I

16   can find that.  I have got it here someplace.

17         MR. JOHNSON:  I believe it is Exhibit B to Ms. Hall's

18   declaration.

19         THE COURT:  B like in boy?

20         MR. JOHNSON:  B like in boy, yes, your Honor.  Yes,

21   Exhibit B.

22         THE COURT:  Unfortunately it is highlighted in such a

23   way that I can't read it.  Tell me what it says.

24         MR. JOHNSON:  This is a copy of that same page.  It is a

25   little clearer.  It includes in the "credits, adjustments and

1    other charges, gross receipts surcharges to recover."  And it

2    says, "State B&O surcharge."

3            THE COURT:  That is evidence that supports your

4    voluntary payment doctrine.  But it certainly doesn't seem to me

5    to me to --  How does it affect what the contract was between the

6    parties?  I mean, you are telling me that you didn't tell the

7    consumer that you were going to charge a B&O tax.  You referred

8    to it as a --

9            MR. JOHNSON:  A gross receipts tax.

10           THE COURT:  You didn't even refer to it as a gross

11   receipts tax, unless we go to the "understanding your bill" and

12   click on a couple of different icons.  All you have said in the

13   contract itself is that there is going to be --

14           MR. JOHNSON:  Other surcharges.

15           THE COURT:  -- network and other surcharges.  I am

16   having trouble understanding that is telling anybody that a B&O

17   tax is going to be charged.  When you get the bill it is there?

18           MR. JOHNSON:  Correct.

19           THE COURT:  I hate to leave what the contract says, but

20   I am having difficulty with your argument that it is in the

21   contract.  But the voluntary payment doctrine may trump if it

22   applies.  So does it apply here?

23           MR. JOHNSON:  Yes, your Honor, it applies.  It

24   applies both to -- it applies to all three, the unjust enrichment

25   claim, the breach of contract claim, as well as the Consumer

 1    Protection Act claim.

 2          THE COURT:  I am most interested in the Consumer

 3    Protection Act claim.  No Washington case has addressed that

 4    issue; is that fair to say?

 5          MR. JOHNSON:  That is absolutely fair to say, your

 6    Honor.

 7          THE COURT:  So one of the issues is whether that issue

 8    gets certified to the Washington Supreme Court.  Let's move

 9    beyond that for the moment.

10       What cases do you think hold that proposition, that they are

11    going to apply the -- even in the Consumer Protection Act arena

12    they are going to apply that voluntary payment doctrine?

13          MR. JOHNSON:  Your Honor, you discussed with Mr. Breskin

14    several cases, the Smith case, for example, which includes a

15    claim under the Illinois Consumer Fraud Act.  That claim was

16    dismissed based on the voluntary payment doctrine.

17       The Telescripps case, which you cited, includes a breach of

18    contract claim.

19       The Dreyfus case includes a statutory consumer fraud claim.

20    The part of the case that talks about the voluntary payment

21    doctrine, as I read that case, your Honor, covers all of the

22    claims, not just the unjust enrichment claim.

23       The notion --  And I digress for just a second.  The notion

24    that in Illinois the voluntary payment doctrine is statutory is

25    incorrect.  The citation on which the plaintiffs rely is 2-619.

1     This is the 1994 version of that.  It is not the codification of

2     the common-law voluntary payment doctrine.

3          The Court in Dreyfus didn't apply any statutory voluntary

4     payment doctrine.  This is simply the statute for the bases on

5     which you could bring a motion to dismiss in Illinois in 1994.

6          There are other --

7               THE COURT:  There may be other states that have said it

8     is going to apply voluntary payment doctrine to a Consumer

9     Protection Act claim.  But as a policy matter, why should the

10    courts apply it where Mr. Breskin argues you didn't disclose it

11    in the contract, there was a failure to disclose?  You say, well,

12    the disclosure came when we sent the bill, you should have

13    studied the bill, so it has equal application and some courts

14    have so applied it.  As a public policy standpoint, if you fail

15    to disclose, and it is misleading, and there is causation, all

16    the other elements, why should the voluntary payment doctrine

17    apply?

18               MR. JOHNSON:  For the same policy reasons that the

19    courts have found that it applies to any other claim.  Those are

20    fairness and finality, that the recipient of the payment should

21    be able to rely on that payment and to be able to use it.

22         Second, there is a finality.  It encourages discourse and

23    discourages litigation.

24               THE COURT:  But that argument would pretty much cut

25    across most types of Consumer Protection Act claims, would it

1   not?  I buy a car and they didn't tell me that the engine is old.

2   I have paid and they have given me a statement that says, the

3   engine is old.  Am I barred from making that claim?

4      Perhaps not a good analogy.  But your argument, if adopted,

5   it seems to me would eviscerate the Consumer Protection Act laws

6   in the State of Washington.  Because most of them are, you misled

7   us or you didn't tell us.  Most of those consumers paid something

8   for whatever they got.  You are telling me that the fact that

9   they paid, then I got some piece of paper that later described

10  it, I am out of luck?

11          MR. JOHNSON:  Your Honor, most of the formulations of

12  the common-law doctrine of voluntary payment includes certain

13  exceptions.  And most of those include an exception for

14  deception.  If the Court finds that there was deception or that

15  there was fraud the voluntary payment doctrine would not apply.

16  It is our contention on this motion for summary judgment that

17  there is no evidence of deception in this case.

18          THE COURT:  What is the difference between deception and

19  fraud?  You seem to be making one.

20          MR. JOHNSON:  The only reason I am using those two words

21  is because the formulation uses those two words.  I can't think

22  of an exception -- a difference between deception and fraud.  I

23  think deception is a form of fraud.

24          THE COURT:  It must mean something different than fraud.

25  Mr. Breskin doesn't allege fraud, but he certainly alleges that

1    the language you used in your contract did not disclose and

2    therefore deceived the person signing up for the contract; isn't

3    that so?

4         MR. JOHNSON:  He does allege that there was a failure to

5    disclose.  Your Honor, the evidence before you is the contract,

6    the availability of the website, the first bill that Mr. Riensche

7    received.  I don't think that there is any evidence that we

8    failed to disclose.

9         Did we use the words B&O in the contract?  No, we did not.

10   But we did use "other surcharges."  We explained what "other

11   surcharges" means.  We explained it includes gross receipts

12   surcharge.  And the first bill he gets says, gross receipts

13   surcharge recovered, state B&O surcharge.

14        So I don't think there is any evidence of a failure to

15   disclose here.  I don't think there is any evidence of deception.

16   I don't think the deception exception to the voluntary payment

17   doctrine applies.  And I think Mr. Riensche's claims, all of

18   them, are foreclosed by the voluntary payment doctrine.

19        Mr. Riensche has argued that he didn't have full knowledge.

20   If there is anyone that had full knowledge it was Mr. Riensche,

21   given his profession, given his role as a B&O tax specialist at

22   the Seattle Times, given the fact that he ought to have a

23   heightened awareness already being a class representative in

24   another class against another wireless carrier over the failure

25   to disclose something on his bill, the fact that he didn't bother

to read his contract.  He didn't bother to read any of the website that was available to him with additional information about it.  He didn't even look at his invoices.  He set up automatic payment of his invoices and paid them without looking at them.

The formulation for the "with full knowledge", is one of the questions you asked in your minute order.  If anybody has full knowledge it is Mr. Riensche.  But the formula is not just actual knowledge, it goes on to say, if he had information available to him.  And clearly he did.  He had more than enough information available to him to tell him what this charge was.  And he paid it anyway.  And he paid it for 18 months before Cingular voluntarily discontinued charging it.

I think under those facts, which are undisputed in this case, that the voluntary payment doctrine applies.  And it applies to breach of contract, unjust enrichment, as well as the Consumer Protection Act.

Your Honor, would you like me to talk any more about the voluntary payment doctrine?

THE COURT:  Why don't we discuss what the plaintiff has to prove under the Washington Consumer Protection Act claim, and particularly whether he has to prove reliance or not?

MR. JOHNSON:  Your Honor, it is our position that he absolutely has to prove reliance.  The causal relationship between the deceptive act and the resulting injury is an

1   essential element of a Consumer Protection Act claim under the

2   Hangman Ridge standard.

3        The Nuttall case, which is a Court of Appeals case, clearly

4   requires to prove causation based on a misrepresentation you

5   have -- or even a failure to disclose, you have to prove that

6   there was reliance.

7             THE COURT:  We don't have a misrepresentation here, we

8   have a failure to disclose, as I understand the plaintiff's

9   argument.

10            MR. JOHNSON:  The argument is a failure to disclose.

11            THE COURT:  How do you prove reliance when you didn't

12  tell me what I am supposed to not to rely on?  Isn't that what

13  Blaylock and Judge Robart was talking about when he was saying --

14  and Judge Bryan when they are saying, you know, we don't have to

15  prove reliance when it was a nondisclosure?  Isn't that basically

16  the State of law in Washington?

17            MR. JOHNSON:  Your Honor, I'm sorry, I haven't read

18  either of the two opinions that you just referred to and that

19  counsel referred to.

20       As I saw the quote that was put out, my assumption is, and I

21  will have to verify my assumption, that the Blaylock case was in

22  the posture of a motion to dismiss.  It what was being alleged,

23  not in a motion for summary judgment where there is no dispute as

24  to the facts.

25            THE COURT:  Even in a context of a motion for summary

1    judgment, which is where we are now, you still have the basic

2    rule.  I guess I would have to say I am uncertain now as to what

3    it is.  I believe the rule is, as counsel has articulated, and

4    that is in a nondisclosure case you don't have to prove reliance

5    in order to win your case.  You have to prove causation by some

6    means.  You can't rely on something you weren't told, can you?

7            MR. JOHNSON:  The reliance element, your Honor, in a

8    nondisclosure case, had it been disclosed, it would have been

9    material to you, if you had known about it would you have made a

10   different decision.  And in this case it is our contention that

11   at least Mr. Riensche knew about it, or certainly had the means

12   to know about it, and he didn't do anything different.

13           THE COURT:  Let's back up just a little bit.  You don't

14   have any facts that would suggest that he knew about it at the

15   time.  All you can argue is that he should have known about it if

16   he had gone on your website and he had studied his bill when it

17   came.

18           MR. JOHNSON:  Correct.

19           THE COURT:  When he signed up for the agreement he says

20   he didn't even read the agreement.  But there is nothing in that

21   agreement that says B&O taxes are going to be paid.  Whether you

22   like it or not, those words are not in there.  And he says that

23   is a failure to disclose.  Why isn't it true that if it is a

24   failure to disclose that he doesn't have to prove reliance?

25       You would agree with me, I think, that the courts have said

 1   the standard of causation in nondisclosure cases is different

 2   from the one that would apply in an affirmative misrepresentation

 3   case?

 4        MR. JOHNSON:  I accept that, your Honor.

 5        THE COURT:  And you would agree that it is virtually

 6   impossible to prove reliance in cases of nondisclosure of

 7   material facts?

 8        MR. JOHNSON:  I would accept that, your Honor, that it

 9   is difficult.  I don't know that I would say it is impossible.  I

10   would agree that any nondisclosure case showing a reliance on

11   something that is not disclosed is difficult.

12        THE COURT:  The Morrison versus International Yogurt,

13   which one of the cases Mr. Breskin was referring to, uses those

14   exact words, "it is virtually impossible to prove reliance on

15   cases allege nondisclosure of material facts."

16      I think plaintiff goes too far in arguing that reliance

17   therefore is not an element of the CPA claim, that it has to be

18   proved by some other means.  How does that all sort out in this

19   case?

20        MR. JOHNSON:  In this case, your Honor, there is still

21   the element of causation.  If they don't have to prove reliance,

22   as even the Schnall case says, you have to prove causation some

23   way.  And there is no way that they have proven causation.

24   Simply saying, I got the bill, I paid it, does not establish

25   causation.  Not under the Hangman Ridge formula.

1    THE COURT:  What is the difference then between proving

2    causation and proving reliance?  I am having trouble

3    understanding the distinction.  If you don't have to prove

4    reliance but you have to prove causation, how do you prove it?

5         MR. JOHNSON:  Well, one way in this case, your Honor --

6    I can't answer for every case.  But in this case one way of

7    looking at it is from hindsight.  He got 18 bills with the B&O

8    surcharge on it, and he continued to pay it.  Was he at all

9    caused to pay that bill because he didn't know in his contract,

10   which he never read, that there was going to be other surcharges?

11     I think the Court can, from the standpoint of subsequent

12   events, look backwards and see there was no causation here.  He

13   wasn't troubled by the B&O surcharge on his invoices.  He

14   continued to pay them.

15     How they can then say there was any --  In most of the

16   failure to disclose cases that come before the Court, it is when

17   the consumer realizes that there is something that is being done

18   that they didn't know about.

19        THE COURT:  When does this causation proof arise?  Is it

20   a question of whether he would have purchased the contract or not

21   purchased the contract?  Are we looking at causation at the

22   moment of entering into the contractual relationship?  Because if

23   we are then these later things don't really help you, do they?

24        MR. JOHNSON:  But this contract, your Honor, allows the

25   consumer, for whatever reason, for no reason at all, to terminate

1   the contract within the first 30 days without any charge.  There

2   would be no early termination fee, no charges for him cancelling

3   that contract.

4       So is it at the moment of clicking on, I accept -- I have

5   read and accepted even though I didn't?  I think the Court could

6   in a causation, under a Consumer Protection Act, look at what

7   were the actions in those 30 days when he had the opportunity for

8   whatever reason.

9       If he suddenly realized, gee, I didn't know that, I don't

10  want this contract if I have to pay a B&O surcharge, he could

11  have cancelled it.  He didn't.

12      THE COURT:  That may have been the causation for not

13  cancelling.  I am still troubled by understanding the distinction

14  that the courts seem to make between proving reliance and proving

15  causation.  If the courts say, well, there are other ways to

16  prove causation other than reliance, how do you do that?

17      MR. JOHNSON:  I don't know for every case, but I think

18  my assertion of causation works in this case.

19      The Schnall opinion does not articulate what are the other

20  ways.  I think that is one of the major failings of the Schnall

21  case, besides the fact that it got it wrong.  I don't think it

22  tells us -- it gives us no guidance whatsoever of what it means

23  to prove causation in other ways other than reliance.

24      THE COURT:  Let's change the facts a little bit, make it

25  interesting here.  Let's assume you put in your first bill a

1    little property tax that you wanted to pass along.  Would that

2    be -- clearly that wouldn't be part of what you signed up for,

3    what your contract and your understanding of the bill and all of

4    those things would have allowed?

5             MR. JOHNSON:  No.

6             THE COURT:  But you decided that you would throw it in

7    anyway.  Would that be a violation of the Consumer Protection

8    Act?

9             MR. JOHNSON:  If Cingular surcharged for some portion of

10   property taxes that it pays to the State of Washington --

11            THE COURT:  Right.

12            MR. JOHNSON:  -- without disclosure?  I would assume it

13   could be a violation of the Consumer Protection Act.

14            THE COURT:  Wouldn't it be fair to say, unless the

15   voluntary payment doctrine gave you a defense, clearly you would

16   be reliable for Consumer Protection Act violation if it was

17   there?

18            MR. JOHNSON:  I would think so.

19            THE COURT:  Would that be true even if it was on your

20   bill, there is a little notation of a surcharge for property

21   taxes?  It is on the bill, he gets it, he doesn't read it.  Has

22   he got a claim under the Consumer Protection Act?

23            MR. JOHNSON:  Your Honor, I go back to the contract,

24   which I know troubles you, but at least in this case we do say --

25            THE COURT:  Let's stick with the hypothetical.  The

1   contract says what it says.  But on your first and second bill

2   you add a line item for property taxes.  Does he have a Consumer

3   Protection Act claim?

4          MR. JOHNSON:  I would think so, your Honor.

5          THE COURT:  All right.  And has he proved causation?

6   How does causation fit into that hypothetical?  I mean, it was

7   not disclosed, he didn't know about, but he saw it.  Can you make

8   the argument, well, he could have cancelled the contract after he

9   got his first bill so it didn't cause the injury?  Is that your

10  argument?

11         MR. JOHNSON:  He could have protested.

12         THE COURT:  Right.  But, like a lot of people, he didn't

13  read the bill.  Has he lost his --  Have you got a causation

14  argument at that point?  He didn't read the bill, or he got it

15  and looked at it, but it didn't register.

16         MR. JOHNSON:  I suppose, your Honor, it depends on the

17  facts of the case whether or not he looked at the bill, whether

18  or not he appreciated what the charge was, whether or not he

19  sought to investigate further what the charge was or whether or

20  not he protested that charge.

21         THE COURT:  Can we agree that if you had put a line item

22  there saying 52¢ for a property tax allocation that he has a

23  cause of action under the Consumer Protection Act unless you have

24  a voluntary payment defense?

25         MR. JOHNSON:  I would think so.

1      THE COURT:  What is the difference between that

2  illustration or hypothetical and the B&O surcharge, which is not

3  mentioned in your contract, which is put on the piece of paper

4  when you send him the bill for the first time where you identify

5  a B&O tax?

6      MR. JOHNSON:  Your Honor, it is all of those pieces

7  together that I think establishes that in this case there is no

8  Consumer Protection Act violation.  I know that the contract

9  doesn't say the words "B&O", but it does say "other charges."

10  I know that the website doesn't say "B&O" but it does say

11  "gross receipts surcharges."  And then he gets the first bill.

12  I mean, the difference between the hypothetical regarding the

13  property taxes --  I don't think a property tax falls within the

14  definition of what the consumer is going to be charged under the

15  contract.  I don't think there is any additional --

16      THE COURT:  You can make the argument, let me get the

17  language, that it is an applicable tax, couldn't you?  Certainly

18  a tax.  I am talking about the property tax.

19      MR. JOHNSON:  I understand.

20      THE COURT:  You've got to have a building to run your

21  organization and sell your telephones.  I am just trying to sort

22  it out.  You are making a distinction here that I am having

23  trouble with.

24  We need to take a quick break.  Why don't you give me in two

25  or three minutes any further remarks on the arguments dealing

1    with the issues we have been talking about this morning.

2           MR. JOHNSON:  Your Honor, I think we have covered them.

3    I think we have -- Cingular has established that there is really

4    no dispute as to any questions of material fact, that the charge

5    was disclosed, that there is no claim for breach of contract,

6    that unjust enrichment does not survive when there is a contract

7    between the parties that covers their relationship and the issue

8    at dispute.  And that the Consumer Protection Act claim doesn't

9    survive here.  Coupled with, I think the voluntary payment

10   doctrine is a complete defense to all three of those.  And so we

11   would ask for summary judgment in favor of Cingular on those

12   claims.  Thank you.

13          THE COURT:  We will take about ten minutes.  And we will

14   come back and we will have about ten minutes per side on the

15   class certification.  I think most of the interesting issues we

16   have already sorted through.  We will take a brief recess.

17   (At this time a short break was taken.)

18          THE COURT:  All right.  We have the plaintiff's motion

19   to certify class.  I am going to hear from you.  I will ask

20   almost no questions.  And I will give you ten minutes a side.  Go

21   ahead.  You may proceed.

22          MR. BRESKIN:  The streamlined version.  Thank you again,

23   your Honor.  David Breskin for the plaintiffs.

24      I wanted to begin quickly, your Honor, by the common

25   experience of consumers in the world of buying cell phones.  I am

1   sure you are familiar with it.  I think everybody in the

2   courtroom probably has a cell phone.

3       The common experience of the consumers, based on what this

4   class action is based, you go to a cell phone provider like

5   Cingular, you buy a phone for the cost of 100, 200 or if you are

6   lucky enough to get the IPod out in the first week, $500.  But

7   that phone can only be used with Cingular service.  You then pay

8   an activation fee of $36.

9       You then are asked to click on contract terms, that we talked

10  about earlier.  No consumer reads the contract.  And not only is

11  that not just hypothetical, we submitted testimony from the

12  vice-president of AT&T wireless who testified to that effect, as

13  being the common experience in the industry.

14      You then will not get a bill for a while.  Then you may not

15  get a bill at all.  Because what is common in the industry now is

16  what is something called auto-pay.  In fact, Mr. Riensche had

17  auto-pay, which explains in part why he never saw the B&O

18  surcharge.

19      You then decide, let's say in this hypothetical, you are

20  going to cancel your service.  You don't get the $36 back.  You

21  don't get a refund of the cost of the phone.  There is no

22  consumer in their right mind who discontinues service, even if

23  they notice a B&O surcharge for 52¢.

24      And this proposition is not something out there.  This is

25  what Judge Posner of the Seventh Circuit said in the Carnegie

1    versus Household International case at 376 F. 3d 656, on why

2    consumer class actions are critical in cases like this where

3    there is a small amount in controversy.

4         He said, "the realistic alternative to a class action is not

5    17 million individual suits, but zero individual suits, as only a

6    lunatic or fanatic sues for $30." That is true.  And here we

7    don't even have $30.  We are talking about this line item charge.

8         So the common experience of the class member, the consumer,

9    is the same in each case.  Even if they wanted to cancel service

10   no one in their right mind would do so because of the cost

11   involved in doing that.

12        Now, you then have the common claims.  And we have talked

13   about those, which is the breach of contract and the CPA claims

14   that we have spent a lot of time talking about.

15        As this Court noted, not only in the Hesse case but in

16   Mortimore versus FDIC, the general rule of law is that in cases

17   where a common consumer contract, common standard form contract

18   is used, it presents an ideal case for classification.  And, of

19   course, the rationale is very easy to understand, because in

20   those cases the same interpretation has to be applied to all

21   consumers.

22             THE COURT:  Give me the FDIC cite?  Who was the judge?

23             MR. BRESKIN:  That was Judge Coughenour's case.

24             THE COURT:  It is in your brief?

25             MR. BRESKIN:  It is.

```
 1          THE COURT:  I will find it.
 2          MR. BRESKIN:  I just located it, your Honor.  It is 197
 3  FRD 432.
 4      As we just noted in prior argument, the Pierce versus
 5  Novastar Mortgage case, Judge Bryan's decision, also certified
 6  similar claims as was brought here.  And there, again, the issue
 7  was an undisclosed fee by a mortgage company.  The fee dispute
 8  was also the issue in the Mortimore case.
 9      So we have this federal court precedent of this court.  And
10  we, of course, also have Washington State precedent on
11  certification of consumer class actions, notably the Schnall
12  case.  But that is certainly not alone.
13          THE COURT:  How about the Davis case of Judge Lasnik?
14  How does that fit into this?
15          MR. BRESKIN:  It was disturbing on a number of levels to
16  see that cited, not the least of which was it was a 2006 decision
17  before Schnall, before Blaylock.  They note citation
18  to apparently --  I can only assume it was not brought to Judge
19  Lasnik's attention, either the Mortimore case or a number of
20  other cases in this jurisdiction in which certification was
21  granted in consumer cases.
22      Judge Lasnik relied principally on the issue having to do
23  with reliance under the CPA.
24      I think we have shown this morning, your Honor, that Schnall
25  says categorically, reliance is not required.  And I think when
```

1    we go back to the language of Schnall for a moment.  It says, it

2    is enough to establish causation that they, the class of

3    consumers, purchased the service and AT&T charged them a fee that

4    was not a tax or government surcharge.  And it goes on.

5         Of course, again we get back to the same common issue about

6    what happens in a case where there is an omission, you are not

7    told, it is not disclosed.

8         And these nondisclosure cases present a common issue because

9    obviously, as the Court pointed out, you can't rely on something

10   you are not told about.

11        And, again, under Washington law --

12             THE COURT:  I guess it is the same issue, though.  How

13   do you prove causation?

14             MR. BRESKIN:  Again, I think Schnall says, building on

15   Picket, the way you prove it, you prove that they engaged in a

16   deceptive practice by not disclosing.  And that based on

17   nondisclosure you ended up paying for something that wasn't

18   disclosed or was not in the contract, in the contract language

19   context.

20        So you prove causation by showing initially the deceptive

21   act.  That is the trigger.  You have to show that the contract

22   was formed through a nondisclosure.  And that is the case I cited

23   the Court to this morning, the Nelson case.

24        If you recall, in that case the defendant disclosed in fact

25   that there would be a mark up but not the percentage -- that the

 1    percentage was 20 percent.  And the Court said there, a violation

 2    of the CPA could be premised on the fact that when the consumer

 3    found out it was 20 percent he could recover both causation

 4    and -- he prove causation and recover damages because they didn't

 5    tell him 20 percent was the mark up.  He knew there was going to

 6    be a mark up, he didn't know it was 20 percent.

 7        You prove that by showing as many of the illustrations you

 8    were pointing out in argument, that in all these cases the

 9    consumer does pay something.  And the common claim that is made

10    is they didn't tell me, they didn't tell me this was going to be

11    an added charge.

12        The way you prove causation is to show that you paid that

13    charge, and to show --  It is not just in a vacuum.  It is by

14    showing that there was a deceptive practice involved in the first

15    instance.  And in the first instance the deceptive practice was

16    the nondisclosure of the charge that you ended up having to pay.

17        Does that make sense to the Court?  I am trying to articulate

18    it.  It seems fairly obvious to me.  I am just trying to

19    articulate it well enough.

20        THE COURT:  The bottom line, you don't like the Davis

21    decision; is that what you said?

22        MR. BRESKIN:  It is not only that I don't like it, I

23    don't think Judge Lasnik did not have the benefit of Schnall, he

24    did not have the benefit of Blaylock.

25        THE COURT:  I don't know that, having read Schnall a

1    couple of times, it benefits anyone, having that opinion in front

2    of us.  I am hopeful that I can -- whatever I decide will be

3    without relying on that case.

4         MR. BRESKIN:  I guess I would just say, your Honor, I am

5    a little --

6         THE COURT:  Most of what they say is dicta, is it not?

7         MR. BRESKIN:  Not that part.  That was the essence of

8    the holding.  It said, the court erred by not granting

9    certification because it had said individual reliance was

10   required.  That was the holding of the case.  The trial court

11   erred in denying class certification because it mistakenly held

12   that reliance had to be proven in a CPA case.

13        THE COURT:  It went up to the Supreme Court.  Didn't the

14   Supreme Court say --  Maybe I am confusing the Picket cases with

15   Schnall.  I think I am.  I am back to Picket.  All right.

16        MR. BRESKIN:  I don't want to belabor the point, but

17   your colleague, of course, found Schnall to be persuasive on a

18   class certification motion as the law of the State of Washington

19   in Blaylock.

20        THE COURT:  There are many differences between this

21   plaintiff and others, in terms of materials they may have

22   received or may have been available when they activated.  Some

23   may have complained about the B&O surcharge.  How would you

24   describe your class?  I don't know that in your motion you told

25   me how your class would be defined.

1          MR. BRESKIN:  Let me say --

2          THE COURT:  Did you give me a proposed order that had

3    the language that you are seeking?

4          MR. BRESKIN:  To be honest with you, your Honor, at this

5    moment I cannot recall.  I believe we did.  The language would

6    simply be similar to the Hesse motion, which was the class of

7    Cingular consumers who were billed and paid a B&O tax surcharge.

8    And it is during the period of time from, I believe, when they

9    initiated it, which I think we have those dates in there --

10         THE COURT:  We do.  Until they stopped --

11         MR. BRESKIN:  Exactly.

12         THE COURT:  -- assessing.

13         MR. BRESKIN:  Did you have a question, your Honor?

14         THE COURT:  No.  I think your time is just about up.

15   Take a couple of minutes and wrap up on class.

16         MR. BRESKIN:  I think the essence of the CPA claim is

17   common because it is the failure to voluntarily offer to the

18   consumer this information for contract.

19       You shouldn't have to go on a website -- some remote

20   website -- first find out they have a website and go on some

21   remote website and find out what you are going to be charged,

22   particularly when they are telling you, and they are advertising

23   in their calling plan brochures it is $59.99 a month.

24         THE COURT:  This sounds like a rebuttal argument for the

25   first arguments.  What does this have to do with class

1   certification?

2          MR. BRESKIN:  I was trying to respond to your comment

3   that people may have different stuff or whatever available to

4   them.  The common experience of consumers, and the practice we

5   are claiming is deceptive, is that they don't voluntarily supply

6   the information.  They don't give that information to you.  They

7   don't tell you in their sales pitch that it is not $59.99 a

8   month.  It is these extra charges.  That is the common

9   experience.

10      The testimony that they submitted, the declaration of

11   Ms. Lamont, attests to that common practice.  She says, as a

12   practice, generally we do not discuss with consumers line item

13   charges before contract.  That is the practice that is common to

14   everybody that we are basing that part of the CPA class

15   certification on.

16          THE COURT:  Thank you.

17          MS. HALL:  For the court reporter, Shelley Hall, also on

18   behalf of Cingular.  I will be talking on the class certification

19   portion.  There is not a whole lot left to say, I don't think.  I

20   will try and keep it brief.

21      I think the Court's comments have gotten to what is the

22   fundamental point to meet any class certification decision, which

23   is how am I going to try this case based on common evidence.  And

24   in this situation there is no common evidence that could be used

25   to try the claims of more than 200,000 potential class members,

1    and from Cingular's perspective to fully prove Cingular's

2    defenses against each and every one of those subscribers.

3        The opposing counsel was just discussing the supposed common

4    experience.  But what is that common experience?  When it comes

5    to a CPA claim you are looking at whether there is a capacity to

6    see whether it is a material omission, whether there is

7    causation.

8            THE COURT:  Talk about material misrepresentation for a

9    moment.  You make an argument 51¢ a month is not material.  That

10   would mean that you would never have a CPA claim.

11           MS. HALL:  Actually I disagree.  Number one, 51¢ might

12   be material to someone.  The charge itself, however, is not at

13   issue.  It is the disclosures.  If Mr. Riensche were challenging

14   the charge itself that would be preempted.

15       So we are looking at whether the disclosure of the B&O

16   surcharge or the nondisclosure of it is material to each and

17   every subscriber.

18       We know it is not material to Mr. Riensche.  He said the

19   things that mattered to him were the rollover minutes, the

20   regional plan, and he threw away everything, he didn't want to

21   read anything.  So we know that is not material to him.

22       So do we use his experience as the named plaintiff as the

23   basis of trial for all the other class members?  That doesn't

24   sound like it would be --  Actually from our perspective maybe

25   that would be good, because we know it is not material to him.

1  But is it material to others out there.  There may be others who

2  read their contract, or who cared about the disclosures, who it

3  mattered to, who were coming from a carrier that didn't charge

4  the B&O surcharge.  Maybe it was material to them.  We know it

5  wasn't material to Mr. Riensche.

6      So how on earth is this going to be tried as a class when the

7  named plaintiff didn't even care about what was being disclosed

8  to him?

9          THE COURT:  Let me throw a broadside at you.

10         MS. HALL:  Sure.

11         THE COURT:  You are contending that all of these claims

12 should be dismissed because of the voluntary payment doctrine?

13         MS. HALL:  Definitely.

14         THE COURT:  I would think you would want a class, so

15 that if I were to rule in your favor on that it would bind all

16 those folks.  If I rule in your favor on this plaintiff there are

17 several hundred thousand out there that will not be bound; isn't

18 that true?

19         MS. HALL:  Well, you raise a very good point, and one

20 that we struggle over back in the office perhaps.  The fact is we

21 don't have a class certified and we are dealing with an

22 individual plaintiff.  We are dealing with his circumstances and

23 his claims.  And so we bring a summary judgment on his claims.

24     Yes, I have to admit it would be nice to have everyone bound

25 by it.  But on this summary judgment motion we can't; we are

1   dealing with his individual claims.

2       And Mr. Riensche, a plaintiff who not only had heightened

3   knowledge of line items but also willfully remained ignorant by

4   refusing to read anything, voluntarily paid under all of his

5   claims, and all of his should be dismissed.

6       But the fact that we have to look at his individual

7   circumstances is what would make class certification, frankly,

8   impossible here.  Because the voluntary payment doctrine -- the

9   analysis is going to differ for each person.

10           THE COURT:  Why?

11           MS. HALL:  Because --

12           THE COURT:  On the Consumer Protection Act claim why is

13   it different?

14           MS. HALL:  On the Consumer Protection Act claim the

15   analysis is the same on voluntary payment-wise as it is for the

16   contract claim and the unjust enrichment claim.

17       Here we have a plaintiff who refused to read anything, who

18   relied on a different sources of knowledge when he signed up for

19   service and voluntarily paid.  We may have other subscribers who

20   chose to read and maybe -- although we think the contract is

21   clear enough and allows it, maybe they didn't understand that.

22   Maybe we have some subscribers who called and complained and paid

23   under protest.  The variety of scenarios is so different.  And

24   Mr. Riensche can't represent all of those situations for the CPA.

25           THE COURT:  Judge Coughenour certified a class in Hesse.

1    Why shouldn't I follow his lead and certify this class to the

2    extent claims remain, for the same reasons that Judge Coughenour

3    stated?

4           MS. HALL:  The facts before your Honor are different

5    than the facts before Judge Coughenour, and the named plaintiff

6    here is much different than the named plaintiffs before Judge

7    Coughenour.

8        And I actually did put together a comparison, based on Judge

9    Coughenour's opinion in Hesse, of some of the things that are

10   different.

11       Judge Coughenour certified a Consumer Protection Act class in

12   large part because before him there was no evidence that the

13   disclosures or the customer experience differed.  We have

14   provided concrete evidence that the purchasing experience differs

15   between stores, on line, that the disclosures received were

16   different over time, that there was supplemental information that

17   customers could and did access.  And we have evidence that people

18   did ask about the B&O surcharge at the point of sale.  Mr. Peck

19   said some people asked him.  And afterward --  Steve Bethel's

20   declaration contains analysis of escalated complaints in which

21   people did receive credits.

22       So that customer experience --  There is simply more evidence

23   before your Honor than Judge Coughenour had in weighing his

24   decision.

25       Class certification is a fluid things and decertification can

1    happen at any point.  Perhaps if there is additional evidence

2    that becomes available in that case it may be a different

3    situation for them.

4        Besides the customer experience, the named plaintiff is very

5    different here.  There is no evidence in the Hesse case that you

6    had a plaintiff who purposely avoided reading anything given to

7    him, who purposely tried to avoid disclosures.  Here we do.

8        We have a named plaintiff who, despite having been involved

9    in another nondisclosure or misrepresentation case, admits that

10   he declined to read any materials before him.

11       His situation is difficult to analyze as common for the rest

12   of the class, whereas perhaps Mr. Hesse's wasn't.  There was no

13   evidence that he was acting in such an unusual way that was so

14   atypical.

15       So there are definitely different facts in this case, and

16   also different evidence of disclosures in this case and

17   experiences.  So we definitely think that --

18           THE COURT:  That would be true --  A lot of people buy

19   cell phones and they buy them in a lot of different ways.  Are

20   you suggesting never could you have a class action involving some

21   failure to disclose?  We will go back to my property tax

22   situation.  Whether you buy it in the store, you buy it on line,

23   you buy it from your neighbor, wherever you buy it from there are

24   going to be different fact patterns.  Aren't the significant

25   issues that have to be decided the same?  That is, is there a

1    voluntary payment defense to a Consumer Protection Act claim?

2    That is an important issue.  And it cuts across everybody

3    regardless of how they entered into the contract.  The voluntary

4    payment doctrine, is that a defense to a contract action in

5    Washington?  That is an issue of law.

6        The details of how you buy and whether you clicked on this

7    icon or that icon or you didn't click on any icons, is that

8    really important in terms of sorting out the important issues of

9    the day here?

10            MS. HALL:  They are very important in sorting out the

11    issues that would be happening at trial.  The decision about

12    whether the voluntary payment doctrine applies to a CPA claim or

13    to a contract claim answers one level of questions.

14        But assuming that it does, then you have to apply that

15    defense to each and every individual subscriber.  And that is

16    where the individual circumstances become important.  And that's

17    what is going to be happening at trial.

18        And there is, frankly, no way for Cingular to prove its

19    voluntary payment defense against all subscribers based solely on

20    Mr. Riensche's experiences.

21            THE COURT:  Why is that so?  You say the voluntary

22    payment doctrine kicks in because everybody gets a statement.  I

23    assume the statements are all the same.  On one line there is a

24    B&O tax surcharge that is disclosed, isn't that right?

25            MS. HALL:  On the invoice, yes.

1      THE COURT:  Why would it be any different between this

2  plaintiff and everybody else that bought during the time period?

3      MS. HALL:  There are a couple of answers to that, your

4  Honor.  One dealing with Mr. Riensche himself, in that he didn't

5  bother to read his invoices so it really didn't matter.  I would

6  put him in that category of people who, for lack of a better

7  term, accepted the risk.

8      THE COURT:  Wait a minute.  That has no merit as far as

9  I am concerned.  As I understand the voluntary payment doctrine,

10  whether you read it or you didn't read it you are still stuck

11  with it.  That is your theory, isn't it?  So what difference does

12  it make whether people read it or they didn't read it, whether

13  they were paying by the auto-pay with their credit card or

14  whether they were writing a check every month?

15      Your contention, as I read it in the briefs, was everybody --

16  it was on that bill, and so the voluntary payment doctrine

17  applies.  Now, is that your position?

18      MS. HALL:  Actually I think our position is a little

19  different than that.  I certainly apologize if the briefing was

20  unclear.  The voluntary payment doctrine does require that there

21  be enough information available for people to have the

22  information they needed to dispute the bill if they want to.

23      THE COURT:  Don't you contend that there was enough

24  information on your bill to trigger that in every --

25      MS. HALL:  On the bill and combined with everything else

1  that was available, I think Mr. Riensche definitely had enough

2  available for him to dispute it if he wanted to, if he needed to.

3          THE COURT:  Let me be sure I understand your position.

4  Does your client contend that the bill itself and the language on

5  the bill itself triggered the voluntary payment doctrine?

6          MS. HALL:  I have to admit, your Honor, that I have

7  never thought of it in that context because it is not isolated.

8  The bill itself is not alone.  It is not the only thing that is

9  there.  There are so many other disclosures and sources of

10  information.  For Mr. Riensche, you can't look at the bill alone

11  in analyzing it for his situation.

12          THE COURT:  That sounds like a no?  It is either a yes

13  or a no.  Do you contend that --  Let me ask it again.  Do you

14  contend that the bill itself, the disclosures on the bill

15  themselves, where you have the one line item, B&O surcharge,

16  whatever it says, 51¢, that that triggers the voluntary payment

17  doctrine, yes or no?

18          MS. HALL:  Oh, I think it does for Mr. Riensche.  Yes, I

19  do.

20          THE COURT:  Well, then it would for everyone else,

21  wouldn't it?

22          MS. HALL:  I think perhaps it would.

23          THE COURT:  Well, then that is a common issue.  We don't

24  need to worry about whether people read it or didn't read it.

25          MS. HALL:  I suppose it would be a common issue if the

1   full knowledge issue hadn't been raised by Mr. Riensche in his

2   statement that he didn't have full knowledge, and that it is not

3   enough.  That puts us in a position where we are having to look

4   at what everyone received and what they knew and didn't know, and

5   whether it would be determined on a class basis that way.

6        So I think it would be difficult to kind of have it both

7   ways.  Say, you can't grant summary judgment against me because I

8   didn't have full knowledge, but you have to grant class

9   certification because everyone's knowledge is going to be exactly

10  the same.  It can't work that way.  You have to have it one way

11  or the other.

12       I think otherwise you are in a box where a defendant can

13  never succeed.  You can't win on the voluntary payment doctrine

14  with an individual because you need full knowledge, yet you can't

15  try full knowledge at trial against all the subscribers because

16  it is assumed that it is going to be common.  So I think there is

17  that tension there.

18       Did your Honor have any other questions --

19            THE COURT:  I don't think so.

20            MS. HALL:  -- on class certification?

21            THE COURT:  I don't think so.  Thank you.  Two minutes

22  on rebuttal.

23            MR. BRESKIN:  I don't know, your Honor.  I don't know if

24  the Court heard what I just heard.  What I just heard was an

25  admission by them that their bill, and what is on the bill alone,

 1   wouldn't be enough to sustain their affirmative defense.  It

 2   might trigger it, but it wouldn't be enough to prove full

 3   knowledge.  That is a startling admission on their part.

 4       It leads one to want to make an oral motion for summary

 5   judgment on their defense.  Because, as you point out, they have

 6   no evidence of anybody who had more knowledge than that.  I mean,

 7   more knowledge than, here is your bill and this is what it says

 8   on the bill.

 9       If that is not proving their defense, then they don't have

10   one.  They just said it wouldn't be enough.

11            THE COURT:  Let me just see what she said.  I understand

12   your position.  What Ms. Hall said, when finally pushed to the

13   mat was, "I think perhaps it would."  That is the bill itself

14   would, as I understood what she was saying.

15            MR. BRESKIN:  Would trigger --

16            THE COURT:  Would trigger the voluntary payment

17   doctrine.

18            MR. BRESKIN:  She distinguished that from the full

19   knowledge one would need.  That is my point.

20            THE COURT:  Thank you.  We are going to take these

21   matters under advisement.  I appreciate all the wonderful

22   briefing and the good arguments today.  Very helpful.  As I

23   mentioned earlier to my law clerk, these issues don't seem to be

24   getting any easier.  We will issue an opinion as soon as we can.

25       The one area that I may ask you to weigh in on whether I

 1    should certify deals with this -- I think it is a fascinating

 2    issue, of whether the voluntary payment doctrine would apply in a

 3    Consumer Protection Act context.

 4        Let's see if we can take the first cut at it, and then

 5    perhaps we will be asking for your input on that issue.  All

 6    right.  Anything further we can do today?

 7              MR. JOHNSON:  No, your Honor.

 8              THE COURT:  Do we have a scheduling order in place in

 9    this case?

10              MR. JOHNSON:  Yes, we do, your Honor.

11              THE COURT:  Refresh my memory.  It is in April?

12              MR. JOHNSON:  My recollection is it is an April of 2008

13    trial date.

14              THE COURT:  All right.  Are any of these other cases

15    going to trial before this one?

16              MR. BRESKIN:  I think our trial date in the Hesse case

17    is before.

18              THE COURT:  Is before?

19              MR. BRESKIN:  If I recall correctly.

20              THE COURT:  And Peck is up on appeal, is it?

21              MR. BRESKIN:  Yes, your Honor.

22              THE COURT:  Do you know if have oral argument set yet?

23              MR. BRESKIN:  Incredibly not.

24              THE COURT:  All the briefs are in?

25              MR. BRESKIN:  I believe it has been fully briefed at

1     this point.

2              MR. JOHNSON:  Yes.  That is the first Peck case.  There

3     is a second Peck case that is still before you.

4              THE COURT:  Yes, I know.  We will be in recess.

5                          (Adjourned.)

1                            CERTIFICATE

2

3

4

5

6

7

8

         I, Barry L. Fanning, Official Court Reporter, do hereby
9   certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                                    _____

                                      Barry L. Fanning
13

14

15

16

17

18

19

20

21

22

23

24

25