1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

19

20

NATHAN RIENSCHE, individually and on
behalf of all the members of the class of
persons similarly situated,

                              Plaintiffs,

v.

CINGULAR WIRELESS LLC, a Delaware
limited liability company, d/b/a Cingular
Wireless, NEW CINGULAR WIRELESS
SERVICES, INC., a Delaware corporation,
d/b/a AT&T Wireless, NEW CINGULAR
WIRELESS SERVICES PURCHASING
COMPANY, L.P., a Delaware limited
partnership, d/b/a Cingular Wireless, and
NEW CINGULAR WIRELESS PCS, LLC, a
Delaware limited liability company, d/b/a
Cingular Wireless,

                              Defendants.

No.  C06-1325Z

ORDER

21

22

23

24

25

26

THIS MATTER comes before the Court on cross-motions for summary judgment and

a motion for class certification.  Having reviewed all papers filed in support of and in

opposition to each motion and having heard the arguments of counsel, the Court does hereby

ORDER:

(1)     Defendants' motion for summary judgment, docket no. 43, is GRANTED.  Plaintiff's

        claims for breach of contract and unjust enrichment, Counts I and IV of the

ORDER   -1-

1    Complaint, are DISMISSED with prejudice based on the voluntary payment doctrine.

2    Plaintiff's claim for violation of Washington's Consumer Protection Act, Count II of

3    the Complaint, is DISMISSED with prejudice based on the merits.

4  (2)    Plaintiff's cross-motion for partial summary judgment, docket no. 57, is DENIED.

5  (3)    Plaintiff's motion for class certification, docket no. 45, is STRICKEN as moot.

6  (4)    The trial and related dates are hereby STRICKEN.  The Clerk is directed to enter

7    JUDGMENT consistent with this Order.

8  (5)    The Clerk is further directed to send a copy of this Order to all counsel of record.

9  **Background**

10    This putative class action, alleging breach of contract, violation of Washington's

11  Consumer Protection Act, and unjust enrichment, was brought by Nathan Riensche against

12  defendants Cingular Wireless LLC, New Cingular Wireless Services, Inc., New Cingular

13  Wireless Services Purchasing Company, L.P., and New Cingular Wireless PCS, LLC

14  ("Cingular Wireless").  The target of Riensche's various claims is Cingular Wireless's

15  practice over a four-year period of passing along to its customers, as a "surcharge," the

16  business and occupation ("B&O") tax assessed against the company by the State of

17  Washington.[1]

18    Nathan Riensche is a certified public accountant, who has previously worked for

19  Deloitte & Touche, as a corporate tax consultant, and for The Seattle Times, as a tax

20  compliance employee.  Riensche Dep. at 7-9, Exh. A to Hall Decl. (docket no. 44)

21  [hereinafter "Riensche Dep."].  Riensche currently works for Partners in Care as the finance

22  director, which for that company is the equivalent of a chief financial officer.  Riensche Dep.

23  at 10-11.  While working for The Seattle Times from 2002 through 2006, Riensche was the

24

25  ────────────────

26  [1] In a previous Order, docket no. 31, the Court dismissed Count III of the Complaint, which
    sought a judgment declaring that the B&O surcharge violates RCW 82.04.500, because the
    state statute is, in this context, preempted by federal law.

ORDER   -2-

person responsible for preparing B&O tax returns and for ensuring that the tax was paid to the State of Washington.  Riensche Dep. at 8-9, 12-13.

On April 2, 2004, while still working for The Seattle Times, Riensche activated cellular telephone service with Cingular Wireless via its "e-store" on the Internet.  Bennett Decl. at ¶ 3, Exh. 7 to Breskin Decl. (docket no. 59) [hereinafter "Bennett Decl."].  Riensche had grown dissatisfied with his previous service provider, AT&T Wireless,[2] and took advantage of the ability to "port" his existing number to a new carrier.  Riensche Dep. at 24-25; Bennett Decl. at ¶ 3.  During the online activation process, Riensche was required to make service selections and input billing information.  Bennett Decl. at ¶ 3.  Before "checkout," Riensche was provided an opportunity to review the Wireless Service Agreement Rate Plan Terms & Conditions (the "Service Agreement").  Bennett Decl. at ¶ 3; *see also* Exh. A to Bennett Decl.  To complete the transaction, Riensche was required to click a dialogue box stating "I have read and agree to the service agreement."  Bennett Decl. at ¶ 3.

The Service Agreement contains the following relevant provisions.[3]  First, it requires the customer to notify Cingular Wireless in writing "WITHIN 100 DAYS OF THE DATE OF THE BILL" of any dispute "WITH RESPECT TO THE BILL, INCLUDING ANY CHARGES ON THE BILL."  Exh. A to Bennett Decl. (emphasis in original).  Second, the Service Agreement indicates that the customer is "responsible for paying all charges *for or*

---

[2] At the time Riensche made the decision to switch service providers, he was a named plaintiff in a putative class action filed in King County Superior Court against AT&T Wireless Services, Inc. ("AWS").  Riensche Dep. at 24.  In that case, the trial court denied class certification, but the Washington Court of Appeals recently reversed and remanded for further proceedings.  *Schnall v. AT&T Wireless Serv., Inc.*, 139 Wn. App. 280, 161 P.3d 395 (2007).  AWS was recently acquired by Cingular Wireless; both companies are now together known as AT&T Mobility.  Hall Decl. at ¶¶ 4-5 (docket no. 44).

[3] The Service Agreement appears to be expressly governed by Washington law.  *See* Exh. A to Bennett Decl. ("The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law.").

ORDER   -3-

*resulting from* services provided" and that charges "include, without limitation, airtime, roamer, recurring monthly service, activation, administrative, and late payment charges; *network and other surcharges*; optional feature charges; toll, collect call and directory assistance charges; any other charges or calls billed to your phone number; *and applicable taxes and governmental fees, whether assessed directly upon you or upon Cingular*." Exh. A to Bennett Decl. (emphasis added).  Finally, the Service Agreement reserves to Cingular Wireless the right to "change any terms, conditions, rates, fees, expenses, or charges . . . at any time."  Exh. A to Bennett Decl.

At his deposition, Riensche did not recall whether, at the time of purchase, he reviewed the terms of the Service Agreement.  Riensche Dep. at 34-35.  He acknowledged that he was given an opportunity to print the Service Agreement, but he chose not to do so, explaining that "I sort of assumed that it's all just standard language that's going to be the same from one cell phone company to the next, and my desire to have a cell phone was greater than my desire to wade through all the terms and conditions, so I just clicked 'Accept.'" Riensche Dep. at 35-36.

After a customer activates service via the e-store, Cingular Wireless generally sends the customer a "Welcome Kit," which contains *inter alia* another copy of the Service Agreement.  Bennett Decl. at ¶ 5.  During his deposition, Riensche acknowledged receiving the cellular telephone from Cingular Wireless in the mail, along with other materials, but he did not specifically recall whether he received the Welcome Kit, and he did not retain any of the items accompanying the phone.  Riensche Dep. at 37-39.

The first bill Riensche received from Cingular Wireless, for the period from April 2, 2004, through May 1, 2004, reflected a "State B and O Surcharge" of $0.51.  Exh. B to Hall Decl. (docket no. 44) [hereinafter "Hall Decl."].  Cingular Wireless had been including the itemized B&O surcharge on customer bills since sometime in 2002.  Lindsey Dep. at 24 (*Peck v. Cingular Wireless, LLC*, Case No. C06-343Z), Exh. 1 to Breskin Decl. (docket

ORDER   -4-

no. 59).  Cingular Wireless continued to assess the B&O surcharge until January 2006, when it voluntarily suspended the practice.  Hall Decl. at ¶ 6.  Apparently during this same period (2002-2006), four other cellular service providers did not include an itemized B&O surcharge on their bills; however, two of the companies  (T-Mobile and Verizon Wireless) listed surcharges described more generically as "regulatory" or "administrative."  Breskin Decl. at ¶ 6 (docket no. 59); _see also_ Exh. 5 to Breskin Decl. (containing billing statements from:  (i) Verizon Wireless, dated Jan. 19, 2006; (ii) VoiceStream Wireless, dated Feb. 10, 2002; (iii) T-Mobile, dated Mar. 19, 2007; and (iv) AT&T Wireless, dated July 9, 2002).

At his initial deposition, Riensche could not recall when he first noticed the B&O surcharge on his bill.  Riensche Dep. at 22.  Riensche indicated that, early in his relationship with Cingular Wireless, he arranged for his cellular telephone bills to be automatically charged to his credit card.  Riensche Dep. at 42-43.  As a result, Riensche often did not review his itemized cell phone statements, instead relying on his credit card statement to gauge whether the total amount of the Cingular Wireless bill seemed accurate.  Riensche Dep. at 42-44.  During his subsequent court-ordered deposition, _see_ Minute Order (docket no. 105), Riensche admitted that he reviewed his bills to see whether the B&O surcharge appeared therein only after suggestion by counsel so that the two men could later talk about how Riensche "might get involved."  Riensche Supp. Dep. at 5:18-22, 6:10-18, Exh. A to Johnson Decl. (docket no. 112).  With the exception of this lawsuit, since becoming a Cingular Wireless customer, Riensche has never found a discrepancy on a bill, called customer service to dispute a bill, or directly contacted Cingular Wireless to inquire, complain, withhold payment, seek a credit or refund, or otherwise "do anything about" the B&O surcharge.  Riensche Dep. at 39-40, 44-45.

In July 2006, Riensche filed the current putative class action in King County Superior Court, alleging that Cingular Wireless breached its various service contracts and was unjustly enriched by collecting the B&O surcharge from customers.  Counts I & IV of Complaint,

1   Exh. A to Notice of Removal (docket no. 1).  Riensche also alleged that Cingular Wireless

2   violated Washington's Consumer Protection Act by failing to disclose and then collecting the

3   B&O surcharge from customers.  Count II of Complaint, Exh. A to Notice of Removal

4   (docket no. 1).  The case was removed to federal court on preemption and diversity grounds.

5   Notice of Removal (docket no. 1).  The Court has previously denied Cingular Wireless's

6   motion to compel arbitration, and granted in part Cingular Wireless's motion to dismiss for

7   failure to state a claim (as to Count III, seeking declaratory judgment).  Order dated Dec. 27,

8   2005 (docket no. 22); Order dated Mar. 22, 2007 (docket no. 31).  Both sides now move for

9   summary judgment as to the substance of Riensche's claims, and Riensche moves for class

10   certification.

11   **Discussion**

12        A.        **Summary Judgment Standard**

13        The Court must grant summary judgment if no genuine issue of material fact exists

14   and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

15   moving party bears the initial burden of demonstrating the absence of a genuine issue of

16   material fact.  _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  A fact is material if it

17   might affect the outcome of the suit under the governing law.  _Anderson v. Liberty Lobby,_

18   _Inc._, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving

19   party need not negate the opponent's claim, _Celotex_, 477 U.S. at 323; rather, the moving

20   party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict

21   in favor of the opponent, _Anderson_, 477 U.S. at 249.

22        When a properly supported motion for summary judgment has been presented, the

23   adverse party "may not rest upon the mere allegations or denials" of its pleadings.  Fed. R.

24   Civ. P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the

25   existence of a genuine issue for trial.  _Id._; _Anderson_, 477 U.S. at 256.  A party cannot create

26   a genuine issue of fact by simply asserting "some metaphysical doubt" as to the material

1   facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather,

2   to survive a motion for summary judgment, the adverse party must present affirmative

3   evidence, which "is to be believed" and from which all "justifiable inferences" are to be

4   favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole, could not

5   lead a rational trier of fact to find for the non-moving party, summary judgment is warranted.

6   *See* *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 932 (9th Cir. 2006); *see also* *Beard v.*

7   *Banks*, 126 S. Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322 ("Rule 56(c)

8   mandates the entry of summary judgment, after adequate time for discovery and upon

9   motion, against a party who fails to make a showing sufficient to establish the existence of

10  an element essential to that party's case, and on which that party will bear the burden of

11  proof at trial.")).

12  **B.        Riensche's Claims**

13          Riensche asserts different theories (breach of contract, unjust enrichment, and unfair

14  or deceptive trade practices), but all of his claims are based on the same factual premise,

15  namely that Cingular Wireless was not entitled to collect a B&O surcharge from its

16  customers during the years 2002 through 2006.  Riensche contends that the surcharge

17  breached the contract between the parties because it was not "for or resulting from" services

18  provided by Cingular Wireless and was not an "applicable tax."  Rather, the surcharge was in

19  the nature of overhead and was assessed regardless of whether the customer made any calls.

20  Riensche argues that, because the surcharge was extra-contractual, Cingular Wireless was

21  unjustly enriched through its collection.  Finally, Riensche claims that the surcharge

22  constitutes an unfair or deceptive trade practice because Cingular Wireless failed to

23  specifically disclose it during the activation (pre-sale) process and did not adequately

24  describe it in the monthly billing statements.

25          On the other hand, Cingular Wireless takes the position that the contractual language

26  authorizes it to impose "network and other surcharges"and "applicable taxes and government

fees," even if assessed against the company rather than its customers.  Cingular Wireless

further asserts that Riensche's breach of contract claim is barred by the voluntary payment

doctrine.  With regard to Riensche's restitution claim, Cingular Wireless argues that recovery

on an unjust enrichment theory is precluded when the parties have a valid contract governing

the dispute.  Finally, Cingular Wireless denies engaging in unfair or deceptive trade

practices, indicating an absence of evidence to suggest that the company made any inaccurate

or improper disclosures or that Riensche relied on any statements or representations made by

Cingular Wireless.  Because Cingular Wireless contends that the voluntary payment doctrine

defeats most of Riensche's claims, the Court first addresses the viability and applicability of

that defense.

**C.      Voluntary Payment Doctrine**

Although class actions challenging a small surcharge in a larger bill have been

brought with surprising frequency nationwide, they have enjoyed minimal success due

primarily to the voluntary payment doctrine.[4]  The doctrine bars recovery for money

---

[4] Indiana stands alone in completely refusing to apply the voluntary payment doctrine to these types of consumer complaints.  *Time Warner Entm't Co. v. Whiteman*, 802 N.E.2d 886 (Ind. 2004); *see BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 771 (Tex. 2005) ("With one exception, courts in every other jurisdiction have applied the voluntary-payment rule to claims that a late fee like the one here is an illegal penalty.").  In *Whiteman*, the Indiana Supreme Court denounced the voluntary payment doctrine, indicating that, "as a matter of policy," favoring "a private enterprise over private individuals" was not appropriate, and that the preferable result is for the enterprise rather than the individual to "suffer the consequences" of erroneous billing.  802 N.E.2d at 892-93.  The *Whiteman* Court cited with approval commentary by the American Law Institute:

> When properly employed, a reference to "voluntary payment" is judicial shorthand for a truth of common experience:  that a person must often choose to act on the basis of imperfect knowledge . . . .  A more appropriate statement of the voluntary-payment rule, therefore, is that money voluntarily paid *in the face of a recognized uncertainty as to the existence or extent of the payor's obligation to the recipient* may not be recovered, on the ground of "mistake," merely because the payment is subsequently revealed to have exceeded the true amount of the underlying obligation.

*Id.* at 892 (quoting Restatement (Third) of Restitution & Unjust Enrichment § 6 cmt. e (Tentative Draft No. 1, 2001) (emphasis in original)).  Based on the preceding language, the Indiana Supreme Court opined that whether the plaintiffs voluntarily paid the late fees at

1  "voluntarily paid with a full knowledge of all the facts," absent fraud, duress, or extortion,

2  even when no obligation to make the payment existed.  70 C.J.S. Payment § 104 (2007).

3  Washington follows the voluntary payment doctrine, calling it a "well-settled general rule."[5]

4  _Maxwell v. Provident Mut. Life Ins. Co._, 180 Wn. 560, 567, 41 P.2d 147, 150 (1935); _see_

5  _also_ _Hawkinson v. Conniff_, 53 Wn.2d 454, 334 P.2d 540 (1959); _Speckert v. Bunker Hill_

6  _Ariz. Mining Co._, 6 Wn.2d 39, 106 P.2d 602 (1940); _Maziarski v. Bair_, 83 Wn. App. 835,

7  844 n.14, 924 P.2d 409, 414 n.14 (1996) (citing _Rainier Nat'l Bank v. Wells_, 65 Wn. App.

8  893, 829 P.2d 1168 (1992)).

9       The voluntary payment doctrine imposes upon a person who disputes the

10  appropriateness of a bill the obligation to assert the challenge either before or

11  contemporaneously with making payment.[6]  _Putnam v. Time Warner Cable of Se. Wis., Ltd._

12  _P'ship_, 255 Wis. 2d 447, 457, 649 N.W.2d 626, 631 (2002).  The doctrine serves two

13  purposes.  First, it permits entities receiving payment for services to rely upon the funds and

14  "use them unfettered in future activities."  _Id._ at 460, 649 N.W.2d at 633; _see Dallas County_

15  ────────────────

16  issue in the face of a "recognized uncertainty" constituted, at a minimum, a genuine issue of
   material fact precluding summary judgment.  _Id._  Because the majority of state courts to

17  consider the issue have employed the voluntary payment doctrine in contexts similar to the
   one here, the Court declines to follow the Indiana Supreme Court's lead.

18  [5] Moreover, Washington does not appear to have abrogated the voluntary payment rule via

19  statute, unlike Florida, which explicitly renders the doctrine inapplicable to breach of
   contract claims.  Fla. Stat. § 725.04; _see also BMG Direct Mktg., Inc. v. Peake_, 178 S.W.3d

20  763 (Tex. 2005) (taking note of the statutory remedies that have supplanted the voluntary
   payment doctrine in a number of contexts, but finding that the rule continues to have limited

21  application in Texas).

22  [6] The Washington Supreme Court recently held that RCW 82.04.500 bars a business from
   tacking a B&O surcharge onto the purchase price.  _Nelson v. Appleway Chevrolet, Inc._, 160

23  Wn.2d 173, 185, 157 P.3d 847, 853 (2007) ("Appleway can disclose or itemize costs
   associated with the purchased item, but unlike a sales tax, it cannot add a B&O tax to the

24  purchase price.").  The _Nelson_ case, however, is factually distinguishable.  In _Nelson_, the
   plaintiff purchased a used car from the Appleway dealership.  _Id._ at 178, 147 P.3d at 849.

25  After negotiating the final price, Appleway added a B&O tax of $79.23.  _Id._  The plaintiff
   paid the B&O tax under protest, and filed a putative class action soon thereafter.  _Id._ at 178

26  & n.3, 147 P.3d at 849 & n.3.  Because the plaintiff in _Nelson_ contemporaneously disputed
   the dealership's collection of the B&O surcharge, the voluntary payment doctrine was not
   addressed.

ORDER   -9-

1    _Cmty. Coll. Dist. v. Bolton_, 185 S.W.3d 868, 876-77 (Tex. 2005) (recognizing the

2    government's strong interest in financial stability in the context of taxation, to which the

3    voluntary payment doctrine likewise applies); _see also_ _Spagnola v. The Chubb Corp._, 2007

4    WL 927198 at *3 (S.D.N.Y.) (the doctrine "exists to protect persons who have had

5    unsolicited 'benefits' thrust upon them").  Second, the doctrine discourages litigation

6    because, after being notified of a dispute by the payor, the payee presumably will take steps

7    to rectify the situation and avoid suit.  _Putnam_, 255 Wis. 2d at 460, 467, 649 N.W.2d at 633,

8    636 ("All that a payor has to do to sidestep the voluntary payment doctrine is to make some

9    form of protest . . . .  When a payee has been given that notice, the funds received can be

10   secured . . . until the dispute is settled."); _see_ _Bolton_, 185 S.W.3d at 877; _see also_

11   _Hawkinson_, 53 Wn.2d at 459, 334 P.2d at 544 ("To allow a person who has made payment

12   of a disputed debt later to seek restitution from the creditor, would be to permit him, by

13   postponing suit, to choose his own time and place for litigation and to change his position

14   from that of a defendant to that of a plaintiff, which would be unfair to the other party."

15   (quoting Restatement of Restitution § 71 cmt. b (1937))).

16                **1.    Merits of the Voluntary Payment Doctrine**

17        In the various cases in which claims were dismissed pursuant to the voluntary

18   payment doctrine, the putative class action plaintiffs unsuccessfully asserted two types of

19   argument: (i) mistake of fact, and (ii) duress or business compulsion.  Riensche makes these

20   same contentions, and the Court concludes that they likewise lack merit.

21                      **a.    No Mistake of Fact**

22        Riensche asserts that Cingular Wireless bears the burden of proving he had "full

23   knowledge" of all facts relevant to payment of the B&O surcharge, citing _Loconti v. City of_

24   _Utica_, 61 Misc. 2d 855 (N.Y. Sup. Ct. 1969).  Riensche's argument runs counter to the

25   weight of authority, which places on the payor an obligation to investigate and to dispute the

26   charge.  For example, courts in Georgia, New York, and Wisconsin, in addressing claims by

cable television customers that the late fees assessed by the respective companies constituted unlawful liquidated damages, rejected the contention that payments were made due to mistake of fact. *Telescripps Cable Co. v. Welsh*, 247 Ga. App. 282, 542 S.E.2d 640 (2000); *Dillon v. U-A Columbia Cablevision of Westchester, Inc d/b/a TCI Cable*, 100 N.Y.2d 525, 790 N.E.2d 1155, 760 N.Y.S.2d 726 (2003); *Putnam v. Time Warner Cable of Se. Wis, Ltd. P'ship*, 255 Wis. 2d 447, 649 N.W.2d 626 (2002); *see also McWethy v. Telecommunications, Inc.*, 988 P.2d 356 (Okla. Civ. App. 1999).  In *Welsh*, *Dillon*, and *Putnam*, the plaintiffs alleged they paid the late fees at issue without knowing that the fees did not accurately reflect the actual costs associated with late payments.  247 Ga. App. at 284, 542 S.E.2d at 642; 100 N.Y.2d at 526; 255 Wis. 2d at 461, 649 N.W.2d at 633.  In essence, the plaintiffs were arguing that they did not realize the late fees were unenforceable.  *See* 247 Ga. App. at 285, 542 S.E.2d at 642.  The courts uniformly held that the plaintiffs had made a mistake of law, not a mistake of fact, and were therefore precluded from recovery by the voluntary payment doctrine.  247 Ga. App. at 285, 542 S.E.2d at 642 ("when payment is made through mere ignorance of the law, it is not recoverable"); 100 N.Y.2d at 526 (finding no mistake because "plaintiff knew she would be charged a $5 late fee if she did not make timely payment"); 255 Wis. 2d at 461-62, 649 N.W.2d at 633-34 ("the customers' failure to know the precise factors underlying Time Warner's decision to charge a $5.00 late fee cannot be held to be a mistake of fact as to the basis for the payment made").

A similar result was reached in a case contesting the collection of certain sales taxes by the provider of land-line telephone services.  *Butcher v. Ameritech Corp.*, 298 Wis. 2d 468, 727 N.W.2d 546 (2006).  In *Butcher*, the putative class action plaintiffs alleged that Ameritech was illegally collecting from customers state sales taxes on services not falling within the definition of "telecommunications services."  *Id.* at 475, 727 N.W.2d at 550. They argued that the voluntary payment doctrine did not apply due to mistake of fact resulting from Ameritech's failure to indicate on the billing statements which services were

1  being taxed.  *Id.* at 483-84, 727 N.W.2d at 554.  The plaintiffs posited that, without such

2  information, they were not on notice that Ameritech was charging for non-taxable items, and

3  they should not be penalized for paying the amounts as billed.  *Id.*  The Wisconsin Court of

4  Appeals was unpersuaded, observing that "it is not a mistake of fact when a customer pays

5  the amount charged without having factual information from the company that would show

6  the customer that the amount charged is unlawful, at least where the customer has made no

7  inquiry to obtain the additional information."  *Id.* at 485, 727 N.W.2d at 555.  The *Butcher*

8  Court applied the general presumption that consumers know the law, and it imposed on

9  consumers a responsibility for "making additional inquiries if they want more information on

10  which of the itemized services have been subject to the state five percent tax."  *Id.* at 486,

11  727 N.W.2d at 556.  Absent such investigation and having made payments without prior or

12  contemporaneous objection, the plaintiffs could not assert mistake of fact to circumvent the

13  voluntary payment doctrine.  *See id.*

14        Here, the parties agree that Riensche paid the B&O surcharge, without protest, each

15  time it appeared on his bill.  Moreover, Riensche admits that he did not routinely or carefully

16  review his monthly statements and did not timely investigate the basis for the B&O

17  surcharge.  Finally, during the same time frame, Washington's Department of Revenue

18  issued a notice indicating that businesses should not separately itemize and pass along the

19  B&O tax to customers,[7] and at least four other cellular service providers did not collect B&O

20  surcharges from consumers.  In light of the undisputed facts, the Court concludes, as a matter

21  of law, that Riensche's payment of the B&O surcharge was voluntary and with full

22  knowledge.  He never contemporaneously protested the surcharge, never took steps to

23

24  [7] *See Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 183-84, 157 P.3d 847, 852 (2007)
25  (indicating that, in April 2002, Washington's Department of Revenue ("DOR") advised that
   "[t]he statute intends the B&O tax to be a part of the seller's overhead. . . . [but] does not
   prevent a seller from itemizing and showing the effect of the tax," and, in contrast, in
26  September 2004, DOR opined that "[t]he B&O tax is a cost of doing business and should not
   be billed to your customer as a separately stated item (as is the sales tax)").

ORDER  -12-

investigate whether it was properly assessed, and apparently never even tried to make himself aware it was being included in his bills.  If he had made inquiry, he could have discovered the interpretation disseminated by the relevant state agency, and if he had actually been disgruntled about the B&O surcharge, he could have sought cellular services from a company that did not pass along the tax to its customers.  <u>See</u> <u>Spagnola v. The Chubb Corp.</u>, 2007 WL 927198 at *3 (S.D.N.Y.) (observing that the plaintiff, rather than voluntarily paying the increasing insurance premiums, could have terminated the policy and "searched for a new provider within a well-developed insurance market").

Moreover, the <u>Loconti</u> case, which Riensche cites, is not on point because it addressed a pure mistake of fact concerning whether the plaintiffs still owned the real property for which they had paid taxes.  61 Misc. 2d at 855-57.  The New York motions judge explicitly noted the distinction between tax payments made under mistake of law, for which no refund would be permitted, and those made under a mistake of fact.  <u>Id.</u> at 857.  In <u>Loconti</u>, the plaintiffs were not aware that the State had appropriated their land by condemnation prior to the date property taxes were due.  <u>Id.</u> at 855.  Based on this "palpable mistake," the plaintiffs were entitled to a refund of the taxes paid.  <u>Id.</u> at 857-58.  Unlike <u>Loconti</u>, here, the mistake at issue is not one of fact (Riensche is not asserting that he erroneously believed he had a cellular telephone); rather Riensche's mistake is one of law, namely whether Cingular Wireless acted contrary to statute or its contract in assessing the B&O surcharge.

### b.   <u>No Duress or Business Compulsion</u>

Riensche asserts that, by the time he knew (or could have learned) about the B&O surcharge, the 15-day grace period for terminating the Service Agreement without a $150 penalty had expired, and thus, he was forced to continue paying the B&O surcharge. Riensche operates under too broad an understanding of duress.  Although courts have recognized a range of situations, termed "business compulsion" or "economic duress," that will counteract the voluntary payment doctrine, the fees challenged in prior consumer class

actions invariably did not rise to the requisite level.  For example, in <u>Bolton</u>, a class of community college students challenged a technology fee set at a minimum of $10, with an increase of $2 per credit hour, up to a maximum of $40, for each student per semester.  185 S.W.3d at 870.  The students asserted economic duress as a counter to the voluntary payment doctrine, but the Supreme Court of Texas rejected the argument, distinguishing the technology fee from the type of taxes or fees the nonpayment of which might forfeit one's livelihood or result in substantial damage to a business.[8]  <u>Id.</u> at 878.  The <u>Bolton</u> Court emphasized that the students could have minimized the fee by taking fewer credit hours and that, although up to ten percent of the student body could have applied for a waiver of the technology fee, not one student had done so.  <u>Id.</u> at 880-81.  Thus, contrary to the students' claims, their payment of the technology fee was not made under duress, but rather was voluntary, and the community colleges were entitled "to rely on a predictable income stream."  <u>Id.</u> at 882.

Likewise, in a putative class action against a cellular service provider, the plaintiffs' assertion of duress was discounted.  <u>Dreyfus v. Ameritech Mobile Communications, Inc.</u>, 298 Ill. App. 3d 933, 700 N.E.2d 162 (1998).  In <u>Dreyfus</u>, the plaintiffs, Larry Dreyfus and Rita Pun, alleged that, during the course of their respective service agreements with Ameritech Mobile, the company breached the contracts and engaged in both statutory and common law consumer fraud by imposing a new $0.02 per minute "interconnect" charge.  <u>Id.</u> at 934-36, 700 N.E.2d at 163-64.  Dreyfus's breach of contract claim was dismissed on the ground that his service agreement did not guarantee against a rate increase.  <u>Id.</u> at 936-37, 700 N.E.2d at 164-65.  Pun's agreement with Ameritech Mobile, however, did warrant that service rates

---

[8] Examples discussed in the opinion included persons forced to choose between paying an illegal license fee to operate a cab or cab company or forfeiting their livelihood or right to do business, and persons forced to choose between paying an unconstitutional franchise fee and paying a substantial penalty plus forfeiting the right to do business in Texas.  185 S.W.3d at 878 (citing <u>Crow v. City of Corpus Christi</u>, 146 Tex. 558, 209 S.W.2d 922 (1948), and <u>Nat'l Biscuit Co. (Nabisco) v. State</u>, 134 Tex. 293, 135 S.W.2d 687 (1940)).

would not change during the two-year contract term.  *Id.*  Nevertheless, Pun's breach of contract claim was dismissed because it was barred by the voluntary payment doctrine.  *Id.* at 937-38, 700 N.E.2d at 165.  On review, the Appellate Court of Illinois affirmed the trial court's conclusion that Pun's payments were not made under compulsion or duress, rejecting Pun's contention that cellular telephone service is an economic necessity.  *Id.* at 940, 700 N.E.2d at 167.  The Court reasoned:

> [P]laintiff Pun has not alleged a lack of access to land-line phones at her work or anywhere else.  Indeed, that would be a difficult argument to formulate as reasonable alternatives to cellular phone service unquestionably exist, whether at plaintiff Pun's place of business, her home, or a payphone.  Thus, we find that cellular phone service is not a necessity and, therefore, plaintiff Pun cannot establish that payments were made under compulsion or duress.

*Id.* (citing *Geary v. Dominick's Finer Foods, Inc.*, 129 Ill. 2d 389, 398, 544 N.E.2d 344 (1989) and summarizing the case as "recognizing that if the service is not a necessity there can be no duress"); *see also* *Butcher v. Ameritech Corp.*, 298 Wis. 2d 468, 727 N.W.2d 546 (2006) (declining to hold that basic, land-line, telephone service constitutes a necessity).

As indicated in *Dreyfus* and *Butcher*, telephone service, particularly cellular service, is not a necessity, and therefore termination of such service (with or without penalty) cannot form the basis of a duress claim.  Moreover, contrary to Riensche's contention, payment of a penalty, albeit a substantial one in comparison to the challenged B&O surcharge, does not rise to the requisite level of compulsion; a $150 penalty for early termination is not analogous to forfeiting one's livelihood or substantially damaging a business.  Finally, Riensche's duress argument assumes that Cingular Wireless would have terminated his cellular service agreement if he had protested and refused to pay the B&O surcharge.  The contract between the parties, however, does not support such presumption; rather, it envisions and provides procedures for such disputes, stating in capital letters the time limit (100 days) and method (in writing, directed to the address listed) for identifying discrepancies.  *See* *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 853, 658 N.E.2d 1325, 1333 (1995) (describing as "wholly speculative" the plaintiffs' claim of compulsion

ORDER   -15-

1    based on the anticipated disruption of cable service due to non-payment).  Thus, the Court

2    concludes that Riensche has not established sufficient duress to excuse him from the

3    requirements of the voluntary payment doctrine.

4                    **2.    Applicability of the Voluntary Payment Doctrine**

5             In their initial briefing, the parties disagreed concerning whether the voluntary

6    payment doctrine applies to breach of contract and statutory fraud or consumer protection

7    claims.  Riensche, however, conceded that the defense can defeat a claim of unjust

8    enrichment.  In light of a recent decision of the Washington Supreme Court, Cingular

9    Wireless now agrees that the voluntary payment doctrine cannot be used as a defense to

10   Riensche's statutory consumer protection claim.  *See Indoor Billboard / Wash., Inc. v.*

11   *Integra Telecom of Wash., Inc.*, 2007 WL 3025836 (Wash. Oct. 18, 2007).  Thus, the only

12   possibly remaining dispute as to the applicability of the doctrine concerns the breach of

13   contract claim.  Texas appears to stand alone in holding, on a non-statutory basis, that the

14   voluntary payment doctrine does not apply in such circumstances.  *BMG Direct Mktg., Inc.*

15   *v. Peake*, 178 S.W.3d 763, 775 (Tex. 2005) ("It is true that, to the extent the subject matter

16   of Peake's claims is covered by the parties' contract, the rule would not apply.  But insofar

17   as Peake alleges an illegal penalty has been assessed, which would operate to void the

18   contractual late-fee payment obligation, his refund suit sounds in restitution for unjust

19   enrichment.").  In all other states in which the voluntary payment doctrine has been held to

20   constitute a viable defense, the underlying theory of recovery has not affected the

21   applicability of the doctrine.  *See, e.g.*, *Stone v. Mellon Mortgage Co.*, 771 So.2d 451, 456

22   (Ala. 2000) ("Claims based on theories of breach of contract, unjust enrichment, and money

23   had and received are precluded by proof that the plaintiff voluntarily paid what he or she is

24   seeking to recover."); *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 855 & n.8, 658

25   N.E.2d 1325, 1334 & n.8 (1995) (affirming the dismissal of claims for breach of contract,

26   fraud, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, and

1  violation of the Illinois Uniform Deceptive Trade Practices Act based on the voluntary

2  payment doctrine); *Putnam v. Time Warner Cable of Se. Wis., Ltd. P'ship*, 255 Wis. 2d 447,

3  453 n.2, 470 n.12, 649 N.W.2d 626, 630 n.2, 637 n.12 (2002) (concluding that the voluntary

4  payment doctrine barred all claims for monetary damages, including violation of the

5  Wisconsin Trade Practices Act, but the defense did not preclude prospective declaratory

6  relief).  Moreover, the Washington Supreme Court has recently verified the doctrine's

7  relevance in the contract context.  *Indoor Billboard*, 2007 WL 3025836 at *14.  The Court

8  therefore holds that the voluntary payment doctrine applies to Riensche's breach of contract

9  and unjust enrichment claims, and the Court dismisses both causes of action based on that

10  complete defense.[9]

11       **D.       Washington Consumer Protection Act**

12       Riensche alleges that Cingular Wireless violated Washington's Consumer Protection

13  Act ("CPA") by "failing to disclose, billing, and collecting" the B&O surcharge.  Complaint

14  at ¶ 5.2, Exh. A to Notice of Removal (docket no. 1).  To establish a violation of the CPA, a

15  private plaintiff must prove:  (i) the defendant engaged in an unfair or deceptive act or

16  practice; (ii) such act or practice occurred within a trade or business; (iii) such act or practice

17  affected the public interest; (iv) the plaintiff suffered an injury to his or her business or

18  property; and (v) a causal relationship exists between the defendant's act or practice and the

19  plaintiff's injury.  *Robinson v. Avis Rent A Car Sys., Inc.*, 106 Wn. App. 104, 113, 22 P.3d

20

21  _____

   [9] Cingular Wireless has raised the question whether Riensche's claim is properly brought as

22  one for breach of contract or one for unjust enrichment; Riensche cannot under Washington
   law maintain both actions.  *See MacDonald v. Hayner*, 43 Wn. App. 81, 86, 715 P.2d 519,

23  523 (1986) ("a claim for unjust enrichment in contravention of a provision in a valid express
   contract" will not be allowed).  Because the Court concludes that, under either theory,

24  Riensche would be precluded from recovery by the voluntary payment doctrine, the Court
   need not decide which cause of action is more appropriate.  Moreover, even if the Court

25  were to rule that the B&O surcharge falls outside the Service Agreement, the conclusion
   would follow that Riensche's claim is simply one for unjust enrichment, not breach of

26  contract, and would be, as Riensche acknowledges, barred by the voluntary payment
   doctrine.  *See Peake*, 178 S.W.3d at 775 (a consumer action seeking a refund is not a "run-of-
   the-mill" breach of contract case, but rather "sounds in restitution for unjust enrichment").

ORDER   -17-

818, 823 (2001).  Cingular Wireless argues that Riensche's CPA claim lacks merit because he cannot identify an unfair or deceptive act or practice and he cannot demonstrate causation. The Court concludes, as a matter of law, that Riensche cannot prove Cingular Wireless engaged in an unfair or deceptive act or practice, and therefore dismisses Riensche's CPA claim.  _Id._ at 114, 22 P.3d at 823 ("If any element is not satisfied, there can be no successful CPA claim.").

### 1.    Unfair or Deceptive Trade Practice

If no dispute exists concerning what the parties did, whether the conduct at issue constitutes an unfair or deceptive trade practice within the meaning of the CPA constitutes a question of law.  _See id._; _see also_ _Indoor Billboard_, 2007 WL 3025836 at *7.  To qualify, the alleged act must have had the "capacity to deceive a substantial portion of the public." _Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co._, 105 Wn.2d 778, 785, 719 P.2d 531, 535 (1986).  Riensche asserts that Cingular Wireless (i) did not disclose, in the Service Agreement, its intention to assess the B&O surcharge, (ii) did not explain the B&O surcharge, and (iii) did not provide information from which a customer could derive how the surcharge was calculated and whether it was "reasonable."  Cingular Wireless responds that (i) the Service Agreement indicates it may assess surcharges, (ii) the web site via which Riensche initiated his cellular service contained an explanation of "gross receipts" surcharges, and (iii) the B&O surcharge appeared as a line item in an appropriate section of the billing statement.  The dispute between the parties boils down to one question:  whether the amount of information disclosed by Cingular Wireless was so insufficient that it had the capacity to deceive a substantial portion of the public.

Although Riensche states his assertions in the absolute, his contention that Cingular Wireless provided no disclosure, no explanation, and no information is not supported by the materials he presented to the Court.  Although the Court agrees with Riensche that the B&O surcharge is not within the express contemplation of the Service Agreement, the Rate Plan

Brochures for 2003, 2004, and 2005 all contain language indicating that Cingular Wireless imposes a "gross receipts surcharge," and the Rate Plan Brochure for 2006 describes an additional surcharge for "revenue-based state and local assessments on Cingular."  Exh. 13 to Breskin Decl. (docket no. 59).  This verbiage appears directly under a chart setting forth the number of minutes included with each of Cingular Wireless's differently priced packages. *Id.*  Moreover, Riensche's first billing statement from Cingular Wireless, for the period from April 2 to May 1, 2004, recites, on a separate line, a "State B and O Surcharge" of $0.51.  Exh. 3 to Breskin Decl. (docket no. 59).  The total monthly service charges for the same period were $66.65, and the total usage charges were $0.02.  *Id.*  Based on this information, Riensche could easily have calculated the percentage or rate being used to compute the B&O surcharge.

When the documents Riensche has proffered are combined with the materials Cingular Wireless has provided in response to Riensche's motion for class certification, the Court can reach only one conclusion, namely that Cingular Wireless did not withhold information in a manner that was likely to deceive a substantial portion of the public.  During the period when Riensche first activated service with Cingular Wireless, the company's web site, which was accessible via the Internet without any password, provided the following explanation for state gross receipts surcharge:  "A fee that Cingular Wireless assesses on the customer that allows it to recover its costs with regard to specific government taxes imposed on the Company's gross receipts.  The Gross Receipts Surcharge is not a mandated charge to the customer."  Bennett Decl. at ¶¶ 3-5 & Exh. A (docket no. 87).  In addition, during the relevant time frame, Cingular Wireless received customer complaints about the B&O surcharge, with some customers receiving credits as a result, evidencing that members of the public had sufficient information to formulate and favorably resolve disputes.  Bethel Decl. at ¶¶ 6-7 (docket no. 95).  The Court therefore concludes, as a matter of law, that Cingular

1    Wireless did not hide from customers its intent to assess or its actual levying of the B&O

2    surcharge,[10] and that Riensche has failed to identify an unfair or deceptive trade practice.

3                        **2.    Causation**

4           Although the Washington Supreme Court's decision in *Indoor Billboard* provides

5    some guidance concerning the standard for causation, the parties continue to disagree

6    concerning whether Riensche must prove reliance on the allegedly unfair or deceptive trade

7    practice.  The *Indoor Billboard* Court held that a private CPA plaintiff must show proximate

8    cause, meaning a causal link between the misrepresentation and the plaintiff's injury.  2007

9    WL 3025836 at *12.  As both Riensche and Cingular Wireless recognize, however, *Indoor*

10   *Billboard* is distinguishable because it dealt with affirmative misrepresentations rather than a

11   failure to disclose, which is what Riensche alleges in this case.  In light of the foregoing

12   ruling regarding Riensche's inability to prove the first element of his CPA claim, the Court

13   need not resolve this dispute.  Moreover, given the remaining lack of clarity in Washington

14   law on the subject, the Court declines to unnecessarily address the issue.  *Compare id.* at *11

15   (with respect to affirmative misrepresentations, rejecting the standard applied by the Court of

16   Appeals in *Pickett v. Holland Am. Line-Westours, Inc.*, 101 Wn. App. 901, 6 P.3d 63 (2000),

17   *rev'd,* 145 Wn.2d 178, 35 P.3d 351 (2001)) *with Schnall v. AT&T Wireless Serv., Inc.*, 139

18   Wn. App. 280, 161 P.3d 395 (2007) (applying the *Pickett* standard in a non-disclosure case).

19   _____

20   [10] The Court finds unpersuasive Riensche's argument that Cingular Wireless violated the
     CPA by failing to explain exactly how the B&O surcharge was calculated.  Riensche
21   provides no authority for imposing such requirement.  Moreover, Riensche's contention
     proves too much; the same could be said for the federal and state taxes Cingular Wireless
22   adds to each customer's bill.  If the Court were to adopt Riensche's view, Cingular Wireless
     would be required to include in its contract forms and promotional materials the rates
23   associated with each tax imposed by federal or state law.  The Court is well aware that tax
     rates, including the B&O rate, change from time to time, and the Court will not impose upon
24   Cingular Wireless the unnecessary burden and expense of including, and continually
     updating, such rates in its advertising or its already lengthy standard service agreement.  Such
25   rates, again including the B&O rate, are readily ascertainable.  *See, e.g.*, Washington
26   Department of Revenue web site (http://dor.wa.gov/Content/FindTaxesAndRates/).

1    **Conclusion**

2         For the reasons articulated, the Court GRANTS summary judgment in favor of

3    Cingular Wireless and DISMISSES plaintiff's remaining claims with prejudice.

4    Accordingly, plaintiff's motion for summary judgment is DENIED and plaintiff's motion for

5    class certification is STRICKEN as moot.  Judgment in favor of Cingular Wireless shall be

6    entered forthwith.

7         IT IS SO ORDERED.

8         DATED this 9th day of November, 2007.

9

10

11                                          Thomas S. Zilly
                                            United States District Judge
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER  -21-